VALLEY NATIONAL BANK, Appellant, v. LEOPOLD FRANK ET AL., Respondents.

### June 27, 1882.

1. One who takes a receipt for portions of a stock in trade upon which he has made advances of money, cannot recover the value thereof from one who, without notice, purchases them from the original owner in whose possession they remained and from whose goods they were never separated.

2. The innocent purchaser has a better equity than he who, having advanced money on part of a stock in trade, leaves them in possession of the original owner.

3. A receipt, given by the owner of a stock in trade to one who has advanced money on a portion of the goods, stating that the goods are held on storage, is not a warehouse-receipt.

4. The delivery of such a receipt is not such a delivery as will constitute a pledge of the property therein described.

APPEAL from the St. Louis Circuit Court, HORNER, J. *Affirmed.*

J. M. & C. H. KRUM and WALTER B. DOUGLAS, for the appellant: The indorsement and delivery of the receipts gave the bank full control of the goods, and gave it a possession sufficient to uphold the pledge. — *Cochran* v. *Ripy*, 13 Bush, 495 ; *Gibson* v. *Bank*, 11 Ohio St. 311 ; *Comp* v. *Tuchels*, 5 Reporter, 623 ; *Carpenter* v. *Snelling*, 97 Mass. 452 ; *Macomber* v. *Parker*, 14 Pick. 497 ; *Lickbarron* v. *Mason*, 1 Smith's Ld. Cas. 1084. The fact that the title passes to the pledgee does not prevent the creation of a pledge, provided the most convenient way of giving constructive possession be by passing title also, and provided the debtor have the right of restitution of the property upon payment of the debt. — *Wilson* v. *Tuttle*, 2 N. Y. 443 ; *Brewster* v. *Hartley*, 37 Cal. 15.

A. BINSWANGER, for the respondents : A bailee must retain possession of the goods in order to preserve his lien upon them. — *Homer* v. *Crane*, 2 Pick. 607 ; *Jarvis* v. *Rogers*, 15 Mass. 389. The owner may also follow and reclaim his goods from a party receiving them wrongfully and with full knowledge. — *Colt* v. *Lasmer*, 9 Cow. 320. An honest purchaser from a party having the power to sell will acquire the title. — *Bugert* v. *Hertell*, 4 Hill, 492. Where the pledgee permits the property to go back into the hands of the owner and remain there indefinitely, the lien ceases against the third persons. — *Day* v. *Swift*, 48 Me. 368. And a *bona fide* purchaser from the pledgeor in possession will hold the property. — *Smith* v. *Sasser*, 4 Jones L. 43. The receipts given in this case were not warehouse-receipts. — *McGrade* v. *German Savings Instn.*, 4 Mo. App. 334 ; *Adams* v. *Bank*, 19 Am. L. Rep. 714. Possession of the personalty pledged with other *indicia* of ownership is sufficient in this case to give title to the purchaser as against the bank. — *Vickers* v. *Hertz*, L. R. 2 H. L. 115 ; *International Bank* v. *Bank*, 71 Mo. 197.

BAKEWELL, J., delivered the opinion of the court.

The petition alleges that plaintiffs, a banking corporation, were the owners of thirty-two bales and twenty thousand pounds of dry hides, worth $6,000, which defendants, who are co-partners, converted to their own use. The answer was a general denial. At the close of plaintiffs' case, the court instructed the jury that, on the pleadings and evidence, plaintiffs could not recover. There was a verdict and judgment accordingly.

In 1879 and 1880, Bienenstok & Trieber were engaged in buying and selling hides, furs, wool, and feathers in St. Louis ; and, for that purpose, occupied a building on Second Street. In order to enable them to carry on their business, they made an arrangement with plaintiffs by which plaintiffs were to advance money on pledge of merchandise.

That arrangement is thus described by the president of plaintiffs : " In the winter of 1879, or commencement of 1880, Trieber came to the bank. He said he would like to borrow money on such goods as he might get in store, and arrange to keep them in store. I finally arranged with him that we should select a man whom he should employ as clerk in the store ; and, at the same time, this man was to act as agent for us, take charge of those goods, and hold them for our benefit, and give the firm of Bienenstok & Trieber receipts, which receipts were to be indorsed by them, handed to the bank, and what money they wanted, borrowed on them. We selected William G. Wolff, and they employed him. He was to be paid by Bienenstok & Trieber. He was subject to the directions of the bank in all matters pertaining to the property, and was to take charge of, watch, and hold, subject to our order, such property as we held his warehouse-receipts for. He was not to surrender it except on surrender of the receipts."

It was further shown by this witness, that three receipts, dated March 11, March 29, and April 16, 1880, were signed by Wolff and indorsed by Bienenstok & Trieber, and delivered to the bank by Trieber, for advances of $7,500 ( $1,500 on the first, and $3,000 on each of the others ) made by the bank to Bienenstok & Trieber, which have never been repaid. The loans had been renewed, from time to time, for periods of fifteen days. The last renewal matured on September 23rd.

These receipts were alike in form. The first was as follows : " St. Louis, March 11, 1880. Received of Charles Bienenstok & Trieber, twelve bales of dry hides on storage at Nos. 100 and 102 South Second Street ; the same to be delivered only on return of this receipt properly indorsed." Signed : " W. G. Wolff." Indorsed : " Chas. Bienenstok & Trieber."

On the recommendation of the bank, Bienenstok & Trieber engaged Wolff. They paid him $75 a month. He

was paid nothing by the bank. He acted as one of the clerks in the general business of Bienenstok & Trieber. There was nothing whatever to indicate that Wolff was in any way in charge for the bank. Bienenstok & Trieber desired that the matter should be kept secret, and this was done. They went on with their business. Their shipping mark was Diamond B; and all goods purchased by them, and all goods coming into the store, were so marked, except a few, now and then received in exchange. The hides included in the receipts in question, were mixed up with the other hides in the store, with nothing to distinguish them. They were treated as the other hides—placed at first on the first floor, then taken to the cellar to be "poisoned," to destroy vermin, and then replaced with the other hides, whenever there was room for them. At first Wolff would permit no goods held on receipt to the bank, to be removed without permission from the bank, but, he says, that the frequency of his applications in the matter of removing the hides as each sale was made in the course of the business of Bienenstok & Trieber, became annoying at the bank. Mr. Hoffman, the president, had told him not to let anything go out of the house without asking him first; but Mr. Goddard, the cashier, after Wolff had gone up there pretty often, told Wolff that he thought he "understood his business; that there was no use in coming up all the time and asking about everything; to let the goods go; that all he wanted was the bill of lading for it; that all the bank wanted was their money." Mr. Goddard, the cashier, says that the original instructions to Wolff were not changed in any way, but he is speaking about the instructions as to keeping the pledged goods separate; his attention is not called to the instructions about letting goods go out of the store; and he corroborates Wolff as to his being told not to ask permission for every sale. He says that he once discharged Wolff because he thought he was not obeying the instructions of the bank,

but took him back again. "Wolff was to get the dray tickets, hold them till he got the bill of lading, which was to be brought to the bank with the draft, and to see that the goods were shipped in accordance with the draft drawn, and that they did not draw for more than the draft." Mr. Goddard further states that the bank knew that Bienenstok & Trieber were buying and selling as before; that the goods were not removed from their store to a warehouse because then Bienenstok & Trieber could not have carried on. That he knew that Bienenstok & Trieber wanted the matter kept secret; that he himself was not particular to keep it secret, and that Trieber was angry on one occasion that he let men in the office know that Wolff was there in charge of the goods; that Trieber was much agitated about this, and Goddard told him he did not see how it could hurt him, since the goods belonged to the bank and Wolff was in charge until they were paid off. The bank knew that Bienenstok & Trieber wished their arrangement with the bank kept a secret. The bank did not tell the circumstances to any one except to a firm with whom they consulted as to the character of Wolff, and, so far as the officers in the bank knew, the matter was unknown except to the parties to the transaction, that firm, and two men, in the presence of whom it was mentioned by Mr. Goddard, as stated before.

Bienenstok & Trieber did a large business in hides, and almost all the hides that came into their store after the arrangement with the bank were pledged to the bank, as were the hides in controversy.

About September 16, 1880, defendants, who are stated to be the largest dealers in hides in St. Louis, purchased the hides in question in the regular course of business of Bienenstok & Trieber, without any suspicion that the bank had any claim, and without any knowledge of the arrangement with the bank. Defendants paid for the hides on delivery, and they were notified, a few days afterwards, of plaintiffs'

claim. Wolff did not know of the sale and delivery of these hides, being sick at the time. He had been almost blind for some time. Bienenstok & Trieber closed up after this sale. They had hardly any hides left on hand when these were sold.

We think this a very plain case. Plaintiffs are not entitled to recover, upon their testimony. Wolff was not a warehouseman, and his receipts to the bank were not warehouse-receipts. Delivery is essential to a pledge; and the possession of the pledgee must be according to the nature of the thing pledged. It does not appear that these hides were ever in the possession of Wolff as bailee for the bank. They, and all the goods in the store, were in the possession of Bienenstok & Trieber, who seem to have traded with them and treated them just as they did any other goods not pledged to the bank. At any rate, the defendants were clearly entitled to judgment on the plain ground that, if one of two innocent parties must suffer from the fraud of a third, the loss should fall on the one who enabled the rascal to commit the fraud. It seems to us that trade would be practically impossible upon any large scale, if a purchase such as that of defendants in this case should be declared void as to the purchasers on the ground that they were not justified in regarding these fraudulent vendors, who had all the *indiciæ* of ownership, as the true owners at the time of the sale. An innocent *bona fide* purchaser, for a valuable consideration, in a case such as the one at bar, may confidently invoke the general rule that possession is *prima facie* evidence of property; and defendants, who were guilty of no carelessness whatever, have a better equity than plaintiffs, whose confidence in Bienenstok & Trieber enabled those persons to hold themselves out as absolute owners of goods which they had induced plaintiffs to regard as pledged to them. The so-called warehouse-receipts in this case, were the receipts of a clerk of Bienenstok & Trieber, for goods owned by the latter, and lying

in their store with their other goods, and just as their other goods lay ; and that store was not a warehouse, for, by that term is meant a building in which merchandise is stored in quantities, not for sale, but to keep for a reasonable compensation until wanted by the owner.

Objections were made to certain questions asked plaintiff's witnesses on cross-examination. It is claimed that defendants' counsel should have confined his questions as to the position of the goods and the disposition of the property on which loans were made by the bank, to the particular hides in the receipts in controversy. We do not think that the court was bound so to limit the cross-examination. Nor, if it was, can we see that plaintiff was or could have been prejudiced. Furthermore, the answers on direct examination seem not to have been confined to these particular hides.

We see no reason for reversing the judgment. Judgment affirmed. All the judges concur.