GRAND AVENUE BANK, Respondent, v. ST. LOUIS UNION TRUST COMPANY et al., Appellants.

St. Louis Court of Appeals, January 26, 1909.

1. **ASSIGNMENTS: Fraudulent Conveyances: Power of Assignee.** Under section 365, Revised Statutes 1899, a general assignee for the benefit of creditors may attack a fraudulent disposition of his property by the assignor made before the assignment whether the creditors were prior or subsequent.

2. **PLEDGES: Possession.** Where personal property was turned over to a creditor, not for the purpose of vesting title but to give such creditor possession with power to sell in case of default in the payment of the debt, the transaction was a pledge of the property and its validity depended upon the possession by the creditor.

3. ——: ——: **Constructive Possession: Warehouse Receipt.** Where property pledged was in the custody of a third person, a receipt from such custodian held by the pledgor was not a warehouse receipt, a delivery of which to the pledgor would be constructive delivery of the property, such third person not being a warehouseman.

4. ——: **Fraudulent Conveyances: Possession.** The statutes relating to sales of personal property and chattel mortgages

require that there shall be not only a change of possession, but the appearance of a change as against creditors and purchasers. But the rule is not so strict in requiring the appearance of possession in the pledgee of an article pledged; a retention for some purposes by the pledgor of the article pledged is not inconsistent with the validity of the pledge. Where a debtor, having a number of pianos stored in charge of a repair man at the debtor's repair shop, in order to secure a debt due a creditor drew up and signed a contract whereby he pledged the pianos to secure the debt and had the repair man sign a statement that he held the same subject to the orders of the creditor, this was sufficient to justify a finding of possession which would render the pledge valid as against a subsequent assignee of the debtor.

Appeal from St. Louis City Circuit Court.—*Hon. Virgil Rule*, Judge.

AFFIRMED.

*Jamison & Thomas* for appellant.

*George W. Winstead* for respondent.

STATEMENT.—This action was begun to recover from defendant, in its own capacity and as trustee under a deed of general assignment, the proceeds of sixteen pianos conveyed by said deed and afterwards sold by defendant. Prior to May 22, 1907, John Feld was a piano dealer in St. Louis. His salesrooms were in the Odeon building on Grand avenue, and his storage room at No. 3505 Easton avenue. On said date he failed for some forty thousand dollars, with assets of about thirty thousand dollars, he estimated. These assets, including the sixteen pianos in dispute in the present controversy, he conveyed by a general deed of trust to the St. Louis Union Trust Company on the date mentioned, to secure his various creditors in proportion to their demands. On March 28, 1907, two months before the execution of the deed of trust, Feld had borrowed from plaintiff bank $1,600 on a promissory note. The money was lent on the credit of the sixteen pianos which were then in

Feld's storage room on Easton avenue, and the note was accompanied by documents constituting a written assignment in pledge of the pianos, which were described and their numbers and locations given. The documents follow:

"EXHIBIT A.

"St. Louis, March 28, 1907.

"For and in consideration of a loan of $1,600.00, made to me this day by the Grand Avenue Bank of St. Louis, I, John Feld, the owner of the following instruments located at 3505 Easton avenue, do hereby pledge to the said Grand Avenue Bank the following pianos, to-wit:"

Here follows list of pianos.

"It is hereby agreed that these pianos can be removed from the above given address by payment of the amount set opposite these pianos herewith and by written order signed by some officer of the said Grand Avenue Bank. I agree to keep the above mentioned pianos insured against loss by fire and assign the policies over to the said Grand Avenue Bank. I further agree to stand the loss in the event any or all pianos are stolen.

JOHN FELD.

"J. HENRY KRIEKEMEIER, witness."


EXHIBIT B.

"St. Louis, March 28, 1907.

$1,600.00.

"On demand after date I promise to pay to the order of the Grand Avenue Bank of St. Louis, Sixteen hundred and no-100 Dollars, for value received, with interest at the rate of 7 per cent from date, payable at the office of Grand Avenue Bank of St. Louis.

JOHN FELD,

"Odeon, Grand and Finney Aves.

"Having executed a promissory note dated at St. Louis, Missouri, on the 28th of March, 1907, for $1,600, payable to the Grand Avenue Bank of St. Louis, or order, on demand after date, with interest from date at the rate of seven per cent per annum; and being desirous of securing the same, and all my other liabilities actual and contingent, to said bank, now existing, or which may hereafter arise, I do hereby pledge to said Bank and to its successors as collateral security for said note and said other liabilities to said bank the following described property: Sixteen pianos located at 3505 Easton avenue, as per attached slip; also agreement signed under this date.

"The present market value of which is $...... of which I am in good faith the owner, the same being fully paid for and free from liens or claims of any kind whatever; and I agree to give additional security to keep up the present margin whenever the market value of the above collateral should decline, and upon notice so to do from the holder of the above note referred to. In default of payment of said note or other of my said liabilities at maturity, or in default of my giving such additional security within twenty-four hours after demand made on me for the same, or in case of my suspension, failure or insolvency, or the commission of any act of insolvency on my part, said bank shall, in addition to the foregoing collateral, have a lien on all notes, drafts, bills receivable or moneys held by or in transit to said bank in my name or for my account, the same to be deemed to have been assigned to said bank as additional collateral for the payment of said note, and all other of my said liabilities, actual and contingent; said bank and its successors to have the option of application of any or all of said collaterals before sale, or of the proceeds thereof after sale, upon any, either or all of said liabilities as it or they may elect; and upon

such default being made, I do hereby authorize said bank by any of its officers or agents, or its successors, to sell or cause to be sold any or all of said collaterals or any substitutes therefor or additions thereto, at public sale, upon such notice, at such place and on such terms as said bank or its successors may deem proper, or at private sale, without notice, if said bank or its successors shall elect to sell, at private sale, and to apply the proceeds, whether of such public sale or private sale; First. To the payment of the expenses incurred in making said sale, including reasonable compensation to said bank, in case the holder of said note is, at the time of making such sale, some one other than the said bank; and, next, to the discharge of the note above mentioned, and, next, to the discharge of all my other liabilities to said bank as hereinbefore set out; any surplus left shall be paid to me. If the proceeds of such sale are not suffcient to pay all my liabilities hereby secured, I agree to pay the balance on demand. In case of a sale of said collaterals, said bank or the holder of any liability hereby secured, may become the purchaser thereof, without any right of redemption on my part.

"Notice delivered at or mailed to my last known place of business or residence shall constitute due notice for additional security.

"JOHN FELD.

"Odeon, Grand and Finney Aves."

Besides those papers, the following so-called warehouse receipt was signed by Feld and delivered to an officer of the bank when the note was executed:

EXHIBIT C.

"St. Louis, Mo., March 1, 1907.

"Received at 3505 Easton avenue, the following described pianos, to-wit:

| | | | |
|---|---|---|---|
| Majestic | 5297 | D. Wal. | 155 |
| Mason | 68383 | Wal. | 151 |

Cecilian     10094 Mah. P. P. 283
John Feld 75223 Mah.          135.
John Feld 75214 Mah.
John Feld 75130 Wal.
John Feld 75232 Wal.
John Feld 75124 Mah. 8 large.
John Feld 75125 Oak 5 small to.
John Feld 69802 Oak 145.
John Feld 69797 Oak.
John Feld 75149 Mah.
John Feld 72367 Mah.
John Feld 75126 M'ah.
John Feld 75123 Mah.
John Feld 73131 Mah.

"These pianos are in my possession now and held subject to the orders of John Feld, owner thereof.

WM. A. MUERER.

"For value received deliver to order of Grand Avenue Bank.

"JOHN FELD.
"WM. A. MUERER."

The signature of Wm. A. Muerer to the last paper was not affixed when it was executed by Feld but later, yet prior to the date of the assignment by Feld to defendant. The significance of Muerer's signature will appear from facts infra. This controversy turns on whether or not there was such an actual or constructive delivery of the pianos to plaintiff in pledging them, as sufficed to pass the title to the bank against the St. Louis Union Trust Company claiming under the deed of trust executed two months afterward, followed by assumption of possession of the property. Muerer worked as a piano repairer in Feld's storage room on Easton avenue, as an employee of the latter, in whose service he continued until Feld failed. He did his repair work in the end of the storage room. Testimony for the bank goes to prove its officers did not know the relation in

which Muerer stood to Feld, but supposed he was in charge of the storeroom or warehouse on Easton avenue on his own account, as there were no signs on the building bearing Feld's name or other indication the premises were his. According to the testimony of those officers, when the loan was made, Mr. Nichols, cashier of the bank, was taken by Feld to 3505 Easton avenue, Feld stating they would go there and he (Feld) would turn the pianos over to the bank. Nichols said he had a list of those shown in the warehouse or storage receipt and that he took possession of the pianos in a formal way: "The sixteen pianos pledged were brought out by Mr. Feld and Mr. Muerer, and the tops were opened and I saw the number and the make of each piano and the cover." He said he saw the descriptions, checked off the numbers on the receipt, and when he had finished walked back where Muerer was doing repair work. Nichols told Muerer to keep an eye on the sixteen pledged pianos. Feld told him Muerer did his (Feld's) repairing but did not say the storage room was his (Feld's); that he (Nichols) went to the storage room to take possession of the pianos for the bank pursuant to an order of its president. He said further Feld stated to Muerer in his presence that he (Nichols) had come out to receive the pianos for the bank. The vice-president of the bank, O. L. Brown, testified that when the loan was made he requested the pianos be removed to the Leonori warehouse; but Feld objected, saying it was unnecessary as the bank would have the same right where they were and to move them would cost $150; that a man was in charge of the building where they were who would be responsible for everything. Brown asked for the keys of the building, and Feld said the bank could have the keys but the banking hours did not agree with Muerer's. Feld tendered the keys to Brown, who did not take them because Muerer might need them at hours the bank was not open, whereby he would be inconvenienced. Brown also said he had

no thought of Muerer being in charge for Feld, but supposed he was in charge for himself. A few days after the first acts of delivery, Brown went to the storage room, looked over the sixteen pianos and told Muerer "these pianos are the property of the Grand Avenue Bank," showing the warehouse receipt to Muerer, who read it and said he understood he was taking care of the pianos for the Grand Avenue Bank, and that neither Feld nor any one else had the right to take any of them without the consent of the bank. Brown asked Muerer to put his name at the bottom of the receipt to show he understood it, and this was done. Brown testified he was there several times afterwards to look at the pianos; that he went by the place every day, saw the pianos were there and Muerer in charge, but generally the door of the room was locked. One day Brown went in. He swore there was a verbal understanding between him and Feld the latter should not go in the storage room without his (Brown's) consent. Somewhat contradictory evidence concerning the circumstances above related, was given for defendant by Feld and Muerer—testimony tending to show that though the pianos were pledged as security to the bank, the bank did not take possession of them by a positive act. Feld said he told the bank officers Muerer was his repairer in charge of the repair shop and could act as a warehouse keeper for the bank, as he (Feld) held him responsible for everything and did not permit him to let anything go off or come on the premises without orders. Muerer was employed by defendant to look after the pianos subsequent to the deed of assignment as he had been engaged to do by plaintiff in the first instance. Regarding the location of the pianos in the room, he said:

"Q. Now, you have testified about what that house contained there. Was there anything there except these sixteen pianos, in the way of pianos, except those you were repairing, were there any pianos in the

room or in the front part of the room where these sixteen pianos were located?    A.    No, sir."

The rulings on the declarations of law need not be exhibited.    From a verdict and judgment in plaintiff's favor, defendant appealed.

GOODE, J. (after stating the facts).—1. In 1897 our statutes relating to voluntary assignments for the benefit of creditors, were amended by the enactment of what is section 365 of the Revised Statutes of 1899, wherein every general assignee is declared to be a trustee for the benefit of the assignor and given "power and authority to prosecute such actions for property and make such defense to claims against the assigned property, as a trustee in a deed of trust, or an attachment or execution creditor with a writ levied on such property, could prosecute or make."    In Morgan v. Machine Co., 84 Mo. App. 514, this amendment was held, and rightly, to have altered the law so that general assignees no longer took the assigned assets subject to all equities or liens enforceable against the assignor, but with the right to attack prior fraudulent dispositions by the assignor which an attaching or execution creditor would enjoy.    Therefore defendant, as Feld's general assignee for the benefit of his creditors, may call into question the validity of the transfer of the pianos in controversy to plaintiff as collateral security.    Probably the debts secured by the deed of assignment arose prior to the attempted pledge of the pianos; but prior as well as subsequent creditors are protected against fraudulent dispositions, such as sales in violation of section 3410 of the Statutes, or mortgages in violation of section 3404.    [Knoop ex rel. v. Distilling Co., 26 Mo. App. 303, 102 Mo. 156; Landis v. McDonald, 88 Mo. App. 335; Harrison v. Mining Co., 95 Mo. App. 80.]

2.    The transaction between plaintiff and Feld was not a sale or a mortgage of the pianos to plaintiff, but

a pledge of them. This is true, because neither an absolute nor a defeasible title was vested in plaintiff, or intended to be, but only possession of the instruments and power to sell if default occurred in the payment of the note secured. The nature of the transaction is not in dispute, and we observe that the writings which accompany it were in the form in common use in commercial circles when property is taken in pledge to secure loans, and similar documents have been treated in legal authorities as creating contracts of pledge. [Jones, Pledges and Coll. Sec. (2 Ed.), secs. 7 to 11 incl.; Dunn v. Train, 125 Fed. 221; First National Bank v. Harkness, 42 W. Va. 156; McCready v. Haslock, 3 Tenn. Ch. 13; Ex parte Fitz, In re Rawson, 2 Lowell, 519, 9 Fed. Cas. 185; Casey v. Cavaroc, 96 U. S. 467.]

As the validity of a pledge depends on possession of the thing pledged, the vital inquiry in the case relates to whether possession of the pianos was delivered to the bank and retained by it in such manner as to create a pledge and continue it in force, especially as against Feld's creditors, to the date when the Trust Company took the pianos under his assignment. We are not helped toward an answer to this question by the receipt executed by Muerer, reciting that he held the instruments subject to Feld's order, the indorsement of the receipt by Feld to plaintiff and Muerer's acceptance of said indorsement. Plaintiff's attorney does not insist the paper was a warehouse receipt, the transfer of which to his client would pass the title to the pianos and be a constructive delivery of them. Feld was no warehouseman, but simply had a storage room where he put some of his musical instruments. Hence a good pledge could not be created by assigning the receipt to plaintiff without turning over the property. [Valley National Bank v. Frank, 12 Mo. App. 460; Conrad v. Fisher, 37 Mo. App. 352.] The good faith of the bank is not impugned, but only the adequacy of the delivery to and retention of possession by it, of the pianos; for-

malities which all the authorities say are essential to a valid contract of pledge, though the facts of many cases leave one uncertain whether or not possession was delivered and kept.

3.    The decisions in this State upon the delivery and continuity of possession essential to valid transfers of chattels have been given mostly in interpreting the first clause of section 3410 of the statutes which says: "Every sale by a vendor of goods and chattels in his possession or under his control, unless the same be accompanied by delivery in a reasonable time, regard being had to the situation of the property, and be followed by an actual and continued change of the possession of the things sold, shall be held fraudulent and void as against the creditors of the vendor or subsequent purchasers in good faith," etc.    In substance it is held the change of possession contemplated by this statute must be open, notorious and unequivocal, and such as to apprise the community or those accustomed to deal with the seller, the property has changed hands and the title passed out of him into the purchaser.    [Knoop ex rel. v. Distill. Co., 26 Mo. App. loc. cit. 311; Claflin v. Rosenberg, 42 Mo. 439, 449.]    In the latter case it was said the fact of delivery must be determined by the vendee using the usual marks of ownership and occupying that relationship to the thing sold which owners of property commonly sustain; further, there must be a complete change of control over the property, and some act which operates as a divesture of title and possession and transference of them into the vendee; that while the goods need not be moved into a new or different house, there must be some open, notorious and visible act, clearly and unequivocally indicative of possession; such as taking an invoice, putting up a new sign, or any other reasonable means that would impart notice of the change to a prudent man.    The like badges of    transfer    of    possession    are    exacted    to    satisfy section 3408, relating to mortgages of personal prop-

erty, when the mortgage is not recorded. [Rock Island Bank v. Powers, 134 Mo. 432.] What the statute on sales of personal property expressly requires for a valid sale against creditors of the vendor and subsequent purchasers in good faith, is delivery of the chattel in a reasonable time, regard being had to its situation, and actual and continued change of possession. Another element has been added by judicial accretion and thereby the statute enlarged. This is, the delivery to and retention by the vendee must be open, notorious and unequivocal and such as to apprise the community the chattel has changed hands and the title passed out of the seller into the purchaser. If this element is lacking, whatever delivery occurred will be treated as none at all against creditors and purchasers. It may be the requirement was essential to the due enforcement of the statute and the courts rightly added it to the express requirements. Their aim was to aid the legislative purpose, but one standard treatise insists too much importance has been attached to possession in determining whether or not sales of property are fraudulent. [Waite, Fraudulent Conveyances (3 Ed.), sec. 245.] It thus appears the doctrine that there must be not only an actual change of possession, but the appearance of a change, has been developed judicially in construing the statutes and in cases turning on it. [Claflin v. Rosenberg, 42 Mo. 439; Wright v. McCormick, 67 Mo. 42; State ex rel. v. Goetz, 131 Mo. 675; Revercomb v. Duker, 74 Mo. App. 570.]

Another proposition to be noticed in connection with the decisions upon the statute regulating sales of personal property is, that it requires sales to be held void as against creditors of the seller when actual and continued change of possession does not appear. The sales are presumed to be void because the statute says they shall be void. [Knoop v. Distilling Co., 26 Mo. App. 303, 314, 102 Mo. 156.] Formerly when the language of the act was different, sales without change of

possession were, at most, only evidence of fraud. [Ibid.] And the great weight of authority is that an insufficient change and continuity of possession is no more than evidence of fraud at common law. [14 Ency. Law (2 Ed.), 361, and cases cited in note 5.] Neither the statute relating to sales or the one relating to mortgages, embraces a contract of pledge, as is apparent from the language used; and that the one relating to chattel mortgages does not, has been decided. [Roeder Bros. v. Brewing Co., 33 Mo. App. 69.] Nevertheless, those enactments and the decisions upon them, demonstrate the policy of the State is to prevent secret dispositions of property by an owner, which may be used to screen his means from legal process in behalf of creditors. This, too, has been the immemorial policy of the common law, of which the various enactments against fraudulent conveyances, including that of 13th Elizabeth, are but declaratory. [Cadogan v. Kennett, 2 Cowp. 432; Clements v. Moore, 6 Wall. 299; Baker v. Humphrey, 101 U. S. 494.] It is apparent there is less call for legislation to require continued change of possession in contracts of pledge than of sales, because as the lien of a pledge hangs on possession, it is lost with loss of posesssion. Moreover, the adjudications leave the impression that fraud is perpetrated less in pledge transactions than in sales and mortgages, and hence, while retention of the article by the pledgee is required, the necessity of preserving the appearance of retention is not so stringent. Cases of fraud in sales and mortgages are multitudinous; but there are few such cases in pledge bailments. The impression is left, too, of a need in commercial affairs for less onerous conditions regarding change and retention of posses-. sion in cases of pledge, than was exacted formerly or is now exacted in sales. [Busch v. Export Storage Co., 136 Fed. 908; 2 Ency. Law (2 Ed.) 855.] Men who buy chattels are willing to go to more trouble and expense to get possession of them than they are of

a pledge. The same need is felt for facility of transfer in the mortgages of chattels, and has been met by permitting the record of mortgages to take the place of delivery of the property. We are not arguing that taking and retention of possession are no longer indispensable to a valid pledge, but simply, that, yielding to the spirit of trade, the courts are less rigorous in respect of what will constitute adequate continuity of possession in the pledgee, and incline to determine the validity of the bailment with reference to whether fraud was intended, or whether if the pledge should stand, it would work a fraud on creditors or a purchaser. On this subject Schouler says:

"Two leading conclusions may be drawn from the precedents which form the modern mosaic of pledge delivery. 1. That in the growing complexity of commercial and mercantile transactions, with so many new classes of incorporeal rights coming into the list of things personal, the disposition increases to apply to all chattel transfers the test of mutual intent on equitable considerations, so that the English and American courts, while abating little of the common-law theory that full change of possession must attend every pledge transaction, have come to swerve very far from it in practice. 2. That, with the present laxity of construction, pledge delivery seems to comport itself differently under these three leading aspects: (a) as between the pledge parties themselves, (b) as between the pledge parties and the pledgor's general creditors, and (c) as between pledge parties and those like a pledgor's attaching creditors or purchasers, or new parties lending on security of the thing, who acquire intervening rights *in rem* without notice. As between the parties themselves, their executory contract so upholds the transaction, while manual delivery continues incomplete, that the pledge security holds by construction, though accompanied by no actual change of possession. As between the pledge parties and general creditors, such

transactions can only be attacked by the latter for fraud upon them; and if there be a bona fide pledge contract, ineffectual for want of delivery, the pledgee may, at any time, take full possession, and maintain his priority over them; for here, at all events, is an executory contract in his favor. But as to those acquiring intervening rights *in rem*, without notice of the pledge, the pledgee who has not taken full possession, generally fails to gain precedence; though to this might sometimes be opposed the suggestion that the pledgor continues in possession as his pledgee's bona fide agent, or, possibly, that the delay in completing certain formalities of delivery had occurred without fault on the pledgee's part, or that such formalities were, under the peculiar aspect of the case, needless." [Schouler, Bailments and Carriers, sec. 199, 203.]

Another author says:

"Possession of the property by the pledgor after it is pledged is not conclusive evidence of fraud, but is prima facie evidence of it. Such possession may be explained and proved to be a possession by the pledgor as agent or servant of the pledgee. If the circumstances make out a good reason for giving the custody and apparent control of the property to the pledgor, who undertook to act as the pledgee's agent, there may not even be any evidence of fraud, and at most the pledgor's possession will only be evidence, either that the pledge had been abandoned, or that the transaction was fraudulent." [Jones, Coll. Secur., sec. 42.]

The courts uniformly profess to require actual and unequivocal delivery of property pledged, in order to prevent creditors and purchasers from believing it is in the hands of the owner and free from possessory liens. [Hale, Bailments and Carriers, secs. 31, 32; Schouler, Bailments and Carriers (3 Ed.), sec. 202; 22 Ency. Law (2 Ed.), 853; Dunn v. Train, 125 Fed. 221; Keiser v. Topping, 72 Ill. 226; City Fire Ins. Co. v. Olmsted, 33 Conn. 473.] We do not say the facts in hand would

fall short of proving continued change of possession sufficient to satisfy the law if the case were one of sale and the statute governed. These facts are: the pianos were segregated and there were no others belonging to Feld near them in the room, or, perhaps, anywhere in the room; they were actually turned over to Nichols for the bank by Feld and taken possession of by Nichols; there was nothing to indicate the room was occupied by Feld or that his property was there; Muerer kept it locked and was always present to notify any purchaser or creditor who came with process that the pianos had been turned over to plaintiff, were in his custody and he had agreed to keep them for the bank and not let any one take them without its order. The instance of a locked storage room distant from a dealer's place of business, and in charge of a repairman, is different from one of a mercantile establishment in charge of a clerk of the vendor, to whom the vendee entrusts the stock and sales go on just as they did before. It is obvious in the latter instance the public is more likely to think the vendor is still in possession and make no inquiry, and with such cases do the opinions deal which are relied on in defendant's brief. [State ex rel. v. Geotz; Revercomb v. Duker, supra.] The circuit judge gave much force to the facts that the pianos were in a building which was not ostensibly in the occupancy of Feld, as he had no signs or indicia of ownership on it and it was distant from his place of business, and that Muerer was more likely to be deemed the proprietor of the place than Feld. In view of these facts he thought a creditor of Feld or a purchaser from him, would not be deceived regarding the status of the property. The authorities examined *infra* will make clear the more important circumstance is this: the pianos were left with a custodian who would notify an intending purchaser, or a creditor with process, they had been pledged to the Bank, and were in his hands

for the bank.   We will quote a pertinent passage from a work of high authority:

"Here, once more, the element of seasonable notice confronts us.  By vigilance and seasonable notice of his claim to third parties, before they acquire adverse claims upon the thing, the pledgee may preserve his rights unimpaired, even though not retaining strict personal possession thereof; for thus is the third party deprived of that bona fide character which gives him priority, as one misled to his detriment without fault and innocently." [Schouler, Bailments and Carriers (3 Ed.), sec. 202, p. 207.]

Beyond doubt the pianos were actually delivered to Nichols, the bank's cashier—were turned into his hands, and as long as he remained by them, the retention of custody was perfect.   Was possession lost as against creditors by entrusting the pianos to Muerer? We have seen there is no statute binding a pledgee to preserve not only possession, but a plain appearance of it, on pain of having his lien declared void as a matter of law if some creditor levies or purchaser buys. Neither does any statute authorize a creditor or buyer to act on appearances; nor any rule of the common law, at least so far as to excuse him from inquiring on such facts as we have here.   The latter proposition follows from the doctrine that when once the subject-matter of the pledge has been delivered to the pledgee, he may retransfer it to the pledgor for a temporary and special purpose, or in a special capacity, without losing his lien as a matter of law.   [Jones, Pledges and Coll., sec. 42 et seq.; Hale, Bailments, sec. 31, p. 122; Schouler, Bailments and Carriers, sec. 201; Story, Bailments (9 Ed.), sec. 299.].   Jones says:

"A delivery of goods to a workman or clerk employed by the pledgor, and possession of such workman in behalf of the pledgee, are sufficient to create and continue the lien."  .  .  .   "But if the clerk or other employee of the pledgor allows the pledged goods to be

confused and intermixed with his employer's unpledged
goods, so that the two classes become indistinguishable,
the pledgee fails to retain such possession of the goods
as enables him to maintain the lien of his pledge."

There was no blending of goods in this case:

Story says on the immediate point:

"As possession is necessary to complete the
title by pledge, so, by the common law, the positive
loss or the delivery back, of the possession of the thing
with the consent of the pledgee, terminates his title.
However, if the thing is delivered back to the owner
for a temporary purpose only, and it is agreed to be
redelivered by him, the pledgee may recover it against
the owner if he refuses to restore it after the purpose
is fulfilled. So, if it is delivered back to the owner in
a new character, as for example, as a special bailee,
or agent. In such a case, the pledgee will still be en-
titled to the pledge, not only as against the owner, but
also as against third persons; for under such circum-
stances, the possession is perfectly consistent with the
existence of the original right of the pledgee. But if
the pledgee voluntarily, by his own act, places the
pledge beyond his power to restore it, as by agreeing
that it may be attached at the suit of a third person,
that will amount to a waiver of his pledge. And, in
like manner, it may, under the like circumstances, be
recovered from a bona fide holder for value; for the
possession of the pledgor will be deemed a continuance
of the possession of the pledgee."

In Hale on Bailments, it is said:

"Even a clerk of the pledgor may hold the prop-
erty for the pledgee. In such case the clerk has a
special possession, distinct from his duties as clerk;
and to constitute such special possession, it is not
necessary that the goods should be removed from the
premises of the former owner. It is sufficient that
they are so far in the custody of the special bailee that
he can at all times have the legal control of them, and

give notice of the lien to any purchaser or attaching creditor, and remove the goods, if such removal should be necessary for the safety of the pledgee."

The point is thus discussed by Schouler:

"What complicates pledge delivery still further in this connection is the doctrine, now well incorporated in our jurisprudence, that the agent to take and keep legal possession for the pledgee may be no other than the pledgor himself. But, the law declares a pledgor's possession on his pledgee's behalf should not be a mere device for the purpose of defrauding his other creditors; nor, as we may conjecture, ought the transaction to indicate that one, a pledgee by right, has simply delayed or abandoned his opportunities of accomplishing a transfer to his own possession. And whether the pledgor's agency for his pledgee can be set up in every instance to disconcert bona fide attaching creditors or purchasers with claims in rem, we may still question; for to permit this doctrine of a pledgor's agency to operate, except as between the parties themselves, and perhaps the general public, is practically to dispense with delivery altogether, and nullify the fundamental rule of bailment."

The true point for decision is whether, in the absence of a statute, the facts in proof permit of no conclusion except that the transfer to and retention of possession by the bank, were inadequate as against the trust company representing Feld's creditors, and even if no actual fraud was intended or occurred. We answer the inquiry in the negative, and deem it novel enough in this jurisdiction, to justify a display of the authorities which have controlled our thought. The note to Lanauz v. Hymel (La.), 25 L. R. A. 577, declares the cases hold with practical uniformity, the selection of a custodian for the subject-matter of a pledge who is in the service of the pledgor, does not invalidate the delivery. Occasionally the pledge has been defeated, not because the article was left in the

custody of an employee of the pledgor to be held for the pledgee, but because, properly considered, it never passed out of the pledgor's own possession, but remained commingled with his other property and was handled and disposed of by him as if he still owned it. These are the facts which caused the attempted pledge to be defeated in Casey v. Cavaroc, 96 U. S. 467, a most instructive decision and one which recognized in full the proposition that a pledge will be valid, though the article is put by the pledgee into the' custody of an employee of the pledgor to hold for the former. A certain bank in the city of New Orleans being embarrassed, requested the Credit Mobilier Society of Paris, to accept drafts drawn by the bank at ninety days, and the Credit Mobilier Society agreed to do so to the amount of one million francs, on the condition that first-class securities should be deposited by the bank with Cavaroc & Son to indemnify the society against loss on account of the acceptance. Cavaroc, Sr., was president of the firm of Cavaroc & Son and also president of the bank, and acted in the transaction as agent for the bank and for the society. He had the discount clerk of the bank select securities amounting to over $200,000, which were placed in an envelope by themselves and handed to the senior Cavaroc for Cavaroc & Son. Cavaroc senior then turned them over to the cashier of the bank for safe keeping. They matured from time to time and Cavaroc had them collected and renewed in the usual form by the discount clerk of the bank. But the annoyance of going to the cashier whenever one fell due soon induced a change of method, and the papers were handed back to the discount clerk that he might more conveniently attend to their collection and renewal. When one was paid to the bank another note was substituted in its place. A large number of notes were exchanged for others, because the former

were more available in the business of the bank.    It was in this manner the hypothecated securities were kept until the bank's failure, when the question of priority came up between the receiver of its assets and Cavaroc & Son, the receiver having filed a bill to obtain possession of the securities for the benefit of creditors at large.    Upon an exhaustive review of many cases it was held in a majority opinion, three judges dissenting, the pledge must fail for want of sufficient delivery and retention of possession.    The opinion said, *inter alia*:

"Was there such a delivery and retention of possession of the collateral securities as to constitute a valid pledge by the law of Louisiana?    Clearly, they were never out of the possession of the officers of the bank, and were never out of the bank for a single moment, but were always subject to its disposal in any manner whatever, whether by collection, renewal, substitution or exchange, and collections when made, were made for the benefit of the bank, and not that of the Creditor Mobilier."

It will be seen the contract failed, not because it provided the collateral securities should be turned over to Cavaroc, who was the main official of the bank and acted for both parties to the transaction; but because, in point of fact, the securities were so handled as to be in the bank's custody and at its disposal.    The reasoning of the opinion supports the proposition that if Cavaroc senior had kept the securities in his own custody, or if they had been kept in the vaults of the bank in the envelope where they were placed, and had not been used by the bank, the bailment would have been effective.    Several circumstances are worthy of remark, concerning this opinion by our highest court. The case was decided on a statute which says the privilege of pledge—meaning thereby the right of a person to hold the article against the rights of creditors and of purchasers from the pledgor—should not "subsist in

the pledge except when the thing pledged, if it be a corporeal movable, or the evidence of the debt, if it be a note or other obligation under private signature, has been actually put and remained in possession of the creditor or of a third person agreed on by the parties." [La. Code, art. 3162.] Two cases from Continental Europe noticed in the opinion in Casey v. Cavaroc, still further illustrate the length to which change of possession must go under the Civil Law to constitute a good pledge. One is where Morin & Co. bailed to Weiland & Co. for a debt, 60,000 bottles of sparkling Burgundy. The wine was turned over to an agent of the bailees and deposited in a vault hired by him, but it was agreed the pledgors should give the wine necessary attention. Sometimes the keys were delivered to them to facilitate attention. In a controversy between the assignee for the creditors of the pledgors, and the pledgees, the bailment was held to have continued intact as to all wine not actually removed by the pledgors. On the contrary, in the case of Ricou v. Syndics of Joly & Co., the champaigne wine which was the subject-matter of the pledge, was left in vaults leased to the creditors, but communicating through open doors with the vaults of the debtors, where their workmen were employed on the wines and there was nothing to indicate which were pledged and which were not, or to prevent substitution. The syndics, or general assignees, prevailed over the lien creditors. In Geddes v. Bennett, 6 La. Ann. 516, the property involved was whisky in the warehouse of a third person, but the creditor allowed the debtor to remove the whisky to the latter's premises and took a receipt stating the barrels of whisky were taken by the debtor on storage. After thus getting possession of the whisky, the debtor parted with it to a third person who, it was held, took title as against the pledgee, because the latter had not complied with the Code in regard to retention of possession. In Weems v. Delta Moss Co., 33 La. Ann. 973, the plaintiff a

judgment creditor, had sold property of the Delta Moss Company under execution, and the question was whether he was entitled to the proceeds to satisfy his judgment, or one Reichard, another creditor, was entitled to them by virtue of a pledge of the property, which was a building and movable effects. The property had been put into the possession of Reichard by the company and entrusted by him to one Luce as his agent. Luce accepted the bailment and subsequently the articles were put in the custody of another person. Both Luce and said other person were employees of the Delta Moss Company, but it was said this fact had no force and could not destroy the effect of the delivery to Reichard. In Jacquet v. Creditors, 38 La. Ann. 863, the property bailed for a debt was machinery used to manufacture tobacco and was situate in the factory. The pledgors went into insolvency and their syndic, or assignee, obtained an order to sell all the debtor's property, including that pledged. Thereupon the pledgee sought to enjoin the sale. The injunction was dismissed, the court saying:

"The contract of pledge stipulated that the property pledged was placed in the possession of one Joaquin Polet, as the agent of the pledgee and he (Polet) intervened in the act for the purpose, as expressed, 'of accepting the trust,' and it is shown by the evidence that to him was delivered the key to the building containing the machinery, etc., pledged. He (Polet) testified that he exercised control over the property for about ten months and took care of it and cleaned the machinery. He was paid for his services as keeper. It is shown that by permission of the keeper and consent of Curtis, Jacquet & Vallette used the machinery at times in their tobacco business, and that Polet was one of their employees. We do not think, however, that these facts derogated from the validity of the pledge. The possession of the property by the pledgee, as shown, was sufficient. [C. C. 3162; Weems v. Moss Company,

33 Ann. 973.] In fact, the property pledged may be left in the possession of the debtor himself, provided his possession is precarious and clearly for account of the creditor. [Conger v. City, 32 Ann. 1250.]"

Another Louisiana case, in which the pledge failed, was In re Succession of Lanaux (46 La. Ann.), 25 L. R. A. 577; but there it was reasonably clear the subject-matter never passed out of the possession of the pledgor, because, though the property (certain certificates of stock) was put in an envelope and marked with the names of the creditors intended to be secured, and these envelopes were inclosed in the debtor's bank box on which his name was inscribed, and it was deposited in the bank by his instruction, before the securities were turned over to the creditors, he died. These cases illustrate what is sufficient change and continuity of possession under the civil law.

Not less impressive as authority than the opinion of the Supreme Court of the United States in Casey v. Cavaroc, is that of the Supreme Judicial Court of Massachusetts, pronounced by Chief Justice SHAW, in Sumner v. Hamlet, 12 Pick. 76. As deputy sheriff Sumner had attached machinery and stock contained in a factory as the property of Stanley & Co. The stock was raw material to be manufactured into flannel and finished goods. Some forty-five pieces of goods were removed from the factory by Hamlet, or at his order, he claiming them under a pledge. Three months before the attachment was levied, Stanley & Co. had selected the forty-five pieces from their stock and placed them in the care of Guild, to keep for the defendant as security for a debt they owed him. It was arranged that if Guild would relinquish to the debtors the particular pieces first selected to be sent to market, he might choose others to the same amount and of like quality in lieu of them. Guild agreed to do this and gave a receipt for the flannels. Some of the pieces were released to the debtors and others substituted in their

place, always by permission of Guild.  He worked in the factory dressing and finishing pieces for a compensation paid by Stanley & Co., he paying his own workmen.  The bailed pieces were kept in a lower room of the factory where he conducted his operations.  The court held the selection and setting apart of the pieces by Guild pursuant to authority previously given by the proprietors, constituted a lien on the property in favor of Hamlet and the lien was sufficiently maintained by the possession of Guild.  It was further said whatever the nature of his general relation to the manufacturers might be, he was the special agent of the defendant in the particular transaction; and to constitute such special possession in him for the defendant, it was not necessary the goods should be removed from the premises of the owners; but was enough they were so far in the custody of the special bailee, that he could at all times have legal control of them, give notice to any purchaser or attaching creditor and remove the goods if such removal should be necessary for the safety of the principal.  The flannels were marked with the initials of Hamlet for delivery to him, but no stress was laid on this circumstance by the court.  The case of Dunn v. Train, 125 Fed. 221, was well considered. The plaintiff, as agent for a paper company, had advanced money in excess of the value of the goods in dispute, which were rolls of paper made from pulp and bailed to him as security for $6,500.  The paper remained in the custody of the agent of the pledgee at the mills of the debtor company.  The man agreed on as bailee of the paper was an employee of said company. This was the memorandum of the transaction:

"Boston, August 31, 1895.

"Messrs. Train, Smith & Company

"Gentlemen:  In order to keep your general lien unimpaired and, at the same time, to save the freight on the goods, we agree to deliver each day to your agent

here, Mr. John H. Kline, the finished product of our paper mill, taking his receipt therefor. These goods are to remain in his possession as your agent and may be kept in store by him in our basement without charge until shipped by him in your name. We are to allow Mr. Kline to act as your agent.

"Very truly yours,
"BANGOR PULP & PAPER CO.
"CHAS. W. WALCOTT, Asst. Treasurer."

Under this arrangement all the finished product of the mill was turned over to Kline, the custodian selected, and deposited in a place inaccessible from other parts of the mill and kept detached from other paper of the company. Afterwards the pledged paper was transferred to a new storehouse and remained there in the care of Gedney, likewise an employee of the paper company, who had superseded Kline as agent for the pledgees. And so there were several successive custodians appointed, all employees of the paper company. Rolls of paper were taken out and others substituted from time to time as sales were made by the company. The contest was between an assignee of the insolvent paper company, representing its creditors at large, and the pledgees. The court assumed change of possession from the pledgor to the pledgee and preservation of possession by the latter, were essential to the validity of the lien, and said the question then was whether the facts authorized a finding that these essentials were observed; said, further, there was no rule of law which rendered the possession and dominion of the pledgee inoperative because the keeper selected to protect the property was in the pledgor's employ, and neither was there a rule requiring removal of the property from the premises; but it was enough if it was actually set apart in the keeping of a special bailee, with authority to notify third persons it was held in pledge. The same doctrine was declared in Busch v. Export Storage Co.,

136 Fed. 908, but the decision turned on whether possession was constructively transferred by the assignment of warehouse receipts covering the property. In Combs v. Tuchelt, 24 Minn. 433, the case was between the receiver of the insolvent defendants and a pledgee. The property was cigars kept in a store room, and the contract of pledge was in the form of a receipt by one Mann (who was an employee of the debtor) of the property to hold for the creditors. This receipt read:

"St. Paul, Minn., December 16, 1875.

"Received of F. W. Tuchelt & Co., 42,000 cigars, valued at $1,654.90, to be held as collateral security for an account of Parker, Holmes & Co., Detroit, in payment of seven notes, $257.40 each, dated November 29, 1875, at St. Paul, Minn., payable at intervals of fifteen days each from above date, the last being payable 120 days from November 29, '75. After the note due January 1, '76, is paid, I am at liberty to relinquish cigars to F. W. Tuchelt & Co. as fast as they pay me cash to apply on notes due Parker, Holmes & Co. The price to be paid is as per schedule prices attached to this receipt.

"(Signed)          CHARLES D. MANN."

At the foot of the schedule of the cigars Mann had written: "The above cigars are in my possession." When the cigars were turned over to Mann he, at the request and by permission of the pledgor and pledgee, took possession and agreed to hold them for the purpose and on the conditions named in the receipt. That case is much like the one at bar, and the court held the evidence conclusively showed the cigars in the schedule were delivered into the possession of Mann as agent for the pledgee; and, further, the evidence reasonably showed Mann's custody was continuous. In McCready v. Haslock, 3 Tenn. Ch. 13, a document construed to be a contract for the pledge of a stock of goods, provided their custody should be entrusted to

a salesman of the debtor for the benefit of the secured creditor. This arrangment was upheld as valid, the court saying, by way of quotation from Smith v. Johnson, 11 Humph. 400: "There is no doubt that by the agreement of the parties, the pledge may be deposited in the hands of a third person, instead of being delivered to the pawnee; and such person will be considered as the agent or servant of the pawnee for keeping possession of the pledge. And it would seem that the pawnee himself might be constituted such agent." The case of Ex parte Fitz, In re Rawson et al., 9 Fed. Cas. 185, was one wherein the controversy was between the assignee in bankruptcy and the pledgee, or trustees representing him. Locomotives were the subject-matter and they had been turned over to the creditors and then put by them in the custody of one of the debtors who agreed to hold for the former's benefit. It was decided the locomotives need not have been removed from the machine shops of the debtors, but could be left there to be finished or even to be sold. It was said though there was more danger of fraud if the pledgor was entrusted with possession than if a third person was, no difference in principle existed whether the pledgor was employed as custodian or one of his clerks, but the matter came down to a question of fraud or good faith. In another part of the opinion this was observed:

"Then, as to keeping possession, it may be kept by an agent, and that agent may be the pledgor. If the circumstances make out a good reason for giving the custody and apparent control to the pledgor, there may not even be evidence of fraud; but, at most, his possession will only be evidence either that the pledge has been abandoned, or that the transaction is covinous. See Sumner v. Hamlet, 12 Pick. 76; Macomber v. Parker, 14 Pick. 497; Hays v. Riddle, 1 Sandf. 248; Way v. Davidson, 12 Gray 465; Cooper v. Ray, 47 Ill. 53; Martin v. Reid, 11 C. B. (N. S.) 730; Thayer v. Dwight,

104 Mass. 254; Thorndike v. Rath, 114 Mass. 116; Weld v. Cutler, 2 Gray. 195."

That case would be more pertinent to the one in hand, if the assignee in bankruptcy had stood in the relation of a purchaser for value and if the subject-matter of the bailment had been less ponderous. The cases of First National Bank v. Harkness, 42 W. Va. 156, and Am. Storage Iron Co. v. German, 126 Ala. 194, are equally strong in their reasoning, but the articles bailed were so unwieldy as to be incapable of more than symbolical delivery. In both cases, however, they were put in charge of agents of the pledgor and the bailments were held valid in opinions, the reasoning of which supports the validity of the present bailment. And, indeed, sixteen pianos cannot be moved without considerable labor and expense; a circumstance not to be ignored in inquiring if there was actual delivery. Decisions in this State touching the point of law involved are meager, but what there are agree in their general statements with the uniform current of authority, to-wit; that such possession of the property pledged as it is susceptible of, must be delivered to the pledgee in order for the transaction to be valid. [Valley National Bank v. Frank, 12 Mo. App. 460.] In that case there was an attempt to pledge certain bales of hides which a firm of dealers in hides had in their place of business, for loans advanced by the bank. The arrangement was for the bank to select a man whom the firm would employ as a clerk in the store, and at the same time he would act as agent for the bank. This clerk would give receipts to the firm for such hides as they wished to pawn and the receipts would be turned over to the bank. The arrangement was condemned, not because it would have been an inadequate delivery of possession if carried out, but because it was not carried out; for there was no separation of the hides pawned from the others in stock, but all alike continued to be sold by the borrowing firm as though there had been no pledge

of any portion.   In Roeder Bros. v. Brewing Co., 33
Mo. App. 69, this arrangement was upheld: a dealer
by the name of Klasing had tubs of butter stored in the
defendant's cold storage room, which butter he attempt-
ed to pledge to the plaintiffs to secure a debt.   What
he did was to sign a note addressed to the plaintiffs,
saying he had on hand nine tubs of butter in the
brewing company's cellar which he retransferred to
the plaintiffs as collateral security; he having bought
them in the first instance from the plaintiffs.   The presi-
dent of the brewing company agreed to hold the butter
if the plaintiffs would deliver possession of it whenever
the receipt should be produced, but before it was pro-
duced the brewing company levied an attachment on
the butter.   It was held there had been sufficient de-
livery of possession to the pledgee, inasmuch as the
property was in the custody of the original bailee and
it had agreed to hold for the benefit of the plaintiffs
before the attachment was levied.   The decision looks
rather strong for this plaintiff considering the ground
it was put on; but it might have been put on the ground
of estoppel; for the attachment by the brewing com-
pany was contrary to their agreement to hold for the
plaintiffs.

Certain cases have been cited by appellant against
the validity of the pledge if the servant of the pledgor
remains in possession.   The main one is Dirigo Tool
Co. v. Woodruff, 41 N. J. Eq. 336.   In said case the
party with whom the pledged property was left, was
superintendent of the factory of the pledgor and its most
conspicuous representative.   Moreover, he made a posi-
tive representation to the creditor who accepted a mor-
gage on the property that there was no prior lien on it.
On these facts the pledgee was held bound by his rep-
resentation, inasmuch as it accorded with the surround-
ings and he had been chosen by the pledgee and thus
enabled to impose on the mortgagee.   Lilienthal v.
Ballou, 125 Cal. 183, appears to be in point in favor of

appellant unless the California statute regulating pledges, on which the decision was founded, required more in respect of change to and apparent continuity of possession in the pledgee, than the common law required. Toms v. Whitmore, 6 Wyo. 220, is not at all in point, for there was an unequivocal and actual delivery of the property.

The judgment is affirmed. All concur.