PATTISON v. DALE et al.

(Circuit Court of Appeals, Sixth Circuit. April 11, 1912.)

No. 2,172.

1. INTERNAL REVENUE (§ 24*)—DISTILLERY WAREHOUSE—STORED LIQUORS—RIGHTS OF OWNERS.

Where distilled liquor is stored in a distillery warehouse under control of the collector of the district and in charge of the internal revenue storekeeper as provided by U. S. Comp. St. 1901, pp. 2122–2124, §§ 3271–3274, et seq. providing for a joint custody of the warehouse by the distiller and the storekeeper, the distiller's surrender of control does not divest

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

his title nor prevent his dealing with the property subject to the paramount rights of the government.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 68–71; Dec. Dig. § 24.*]

2. WAREHOUSEMEN (§ 15*)—PLEDGES—WHISKY IN DISTILLERY WAREHOUSES. U. S. Comp. St. 1901, p. 2130, § 3287, provides that, as spirits are received in a distillery warehouse, the gauger or storekeeper must place on the head of each barrel an engraved stamp signed by the collector or storekeeper and gauger, showing number of proof gallons, name of distiller, date of receipt in the warehouse, and serial numbers of barrels in progressive order, and that no two or more casks or packages warehoused in the same distillery shall be marked with the same number. *Held,* that where, after spirits had been deposited in a distillery warehouse and properly marked as provided, the distiller pledged a certain number of barrels specifically designated by number, by issuing warehouse receipts to the pledgee therefor, describing particular barrels by number, number of wine gallons, the date when made, and the number of warehouse stamp, etc., and thereafter became a bankrupt, he thereby effectively created an equitable lien in favor of the pledgee, the validity of which neither he nor his trustees could be heard to deny.

[Ed. Note.—For other cases, see Warehousemen, Cent. Dig. §§ 31–34, 37; Dec. Dig. § 15.*]

Petition to Review, and Appeal from, an Order of the District Court of the United States for the Southern District of Ohio.

In the matter of bankruptcy proceedings of David Rohrer. On petition of Edward M. Pattison to review, and appeal from, an order of the District Court (186 Fed. 997) denying petitioner's claim as against Charles W. Dale and others, trustees of the bankrupt, to certain whisky in distillery warehouses, pledged by the bankrupt. Order and decree reversed, and cause remanded, with instructions to overrule defendant's demurrer to such claim.

This proceeding is to review an order made by the referee and affirmed by the District Court, sitting in bankruptcy, holding that certificates called warehouse receipts describing certain barrels of whisky and given to secure present loans, were invalid, and that the whisky be held by the trustees and administered free of any lien or claim of the holder of the certificates. David Rohrer was adjudged a bankrupt November 15, 1909, and trustees were appointed, who in December following filed an application in the court below stating that Rohrer had been engaged in distilling whiskies at his distillery in Germantown, Ohio; that as part of his distillery plant he maintained four buildings and used them only for storing his whisky and improving it by age and until the government tax was paid; that at the time of the adjudication there were stored in three of these buildings 9,849 barrels of whisky, which (with 32 barrels since sold under order of court) are claimed to have passed into possession of the trustees; that certain persons named claim interests in the whisky, some claiming to have bought, others to have bought from such vendees parts of their holdings, others to have loaned money to Rohrer upon pledge; that the "entire number of barrels of whisky were all the time in the actual and exclusive possession and control, from and after its manufacture and deposit in said storehouses," of Rohrer; that the whisky was never delivered to such vendees and pledgees or into their possession and control. The prayer is that such claimants be required to file answers and cross-petitions setting up the nature of their several claims, and that on final hearing the rights and interests of the parties may be ascertained and determined, and also for an order to sell the whisky.

Pattison appeared by answer and intervening petition and admitted the manufacture and storage of the whiskies, but denied the alleged possession

of Rohrer or that of the trustees, and alleged that the whiskies were and are "in the sole and exclusive possession and control of the government of the United States"; that the taxes due the United States on the whiskies at the time of the adjudication are unpaid; that on February 23, 1906, he loaned Rohrer $5,000 upon his note for that sum payable in four months, which was renewed from time to time, and to secure same Rohrer assigned and transferred in writing his entire interest in 700 barrels of the whisky, which were stored in warehouses Nos. 1 and 2 before mentioned and described by serial numbers placed on the barrels. June 29, 1905, Pattison loaned a further sum of $500 to Rohrer, who gave his four months' note, and it in like manner has been renewed from time to time, and to secure the original note and renewals Rohrer assigned and transferred to Pattison in writing 100 barrels of whisky then stored in warehouse No. 1, describing the barrels by serial numbers; that there is due $5,500 with interest from January, 1910; that at the times the money was loaned, Rohrer delivered to Pattison five written instruments, copies of which are attached to the pleading and each of which, except descriptions and dates, is as follows:

"Germantown, O., Feb. 23rd, 1906.

"Received in my Distillery Bonded Warehouse No. 1, First District of Ohio, for account and subject to the order of E. M. Pattison, deliverable only on the return of this warehouse receipt and the written order of the holder thereof, and on payment of the United States government tax and all other taxes and storage at the rate of five cents per barrel per month from storage free.

"Two hundred barrels D. Rohrer Pure Bourbon Whisky, entered into bond as follows:

"Serial Number, 108003, 108202; net wine gallons, 9810.73; proof, 101, 102; proof gallons, 9988.28; when made, Feb. 15, 16, 17, 19, 20, 21, and 22, 1906; warehouse stamp, Y 45103, 302.

"Gauged by F. P. Thompson, U. S. Gauger.

"Loss or damage by fire, the elements, riots, accidents, evaporation and shrinkage at owner's risk. It is hereby guaranteed that the loss by natural evaporation and on account of defective cooperage on each and every barrel of this whisky shall not be more than one gallon in excess of the government allowance during the first seven years of the bonded period.

"It is expressly provided that in the payment for excess under this guarantee, the basis of settlement shall be the cost price of said whisky in bond at the date of tax payment figured upon the original contract price therefor, and the carrying charges thereon added thereto, together with the internal revenue tax thereon at the rate of tax imposed by the internal revenue law upon distilled spirits at the date of the withdrawal.

"The owner of the whisky under this receipt in accepting it agrees to furnish the money to pay all taxes when the same becomes due.

"This warehouse receipt is given in conformity with the warehouse laws of the state of Ohio and the laws of the United States in force at this date.

"David Rohrer, Proprietor."

It is alleged that 590 barrels of this whisky were sold and removed from the warehouse by Rohrer without the knowledge or consent of Pattison, but that 210 barrels remain. The prayer is that as against the trustees or any other defendants the court adjudge title to the whisky in the 210 barrels to be in Pattison. Later, an amendment was made alleging in substance that for more than 40 years, and ever since the enactment of the revenue laws relating to the storing of whisky in distillery warehouses, it has been the usual and customary course of business of distillers to sell, pledge, and transfer whisky deposited by them in such warehouses by the issuance and delivery of warehouse receipts, and describing and identifying the whisky sold or pledged, by the serial numbers of the barrels, dates of manufacture, warehouse stamps thereon, number of warehouse, and agreeing in the receipts to hold the whisky for account and subject to the order of the vendees and pledgees, and so to obtain money and advances of money to enable them to carry on business as distillers; that during all this time distillers, bankers, brokers, dealers in whisky, etc., have under such custom and usage

regarded and considered the warehouse receipts as giving constructive possession of the barrels of whisky, and as conveying either an absolute title or special interest according to the nature of the transaction, and as partaking in many respects of the character of commercial paper, transferable by indorsement either absolutely or as collateral security, and as investing the holder of the receipts with title, property in, or possession of the barrels of whisky mentioned in the receipts, and as constituting the owner of the warehouse issuing and delivering the receipts as bailee for the vendee or pledgee; that this practice has become an important part of the commercial system of the country, and is well known and understood.

The trustees filed a general demurrer, which was sustained by the referee, and his action was affirmed. The order is that the whisky be held by the trustees and administered free of all claim and lien of Pattison, and the case was brought here both on appeal and petition to revise in matter of law. No question is made touching remedy.

John Healy, W. H. Mackoy, and M. L. Buchwalter, for petitioner.
L. W. James and T. B. Paxton, Jr., for respondents.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

WARRINGTON, Circuit Judge (after stating the facts as above). The legal effect of the warehouse documents [1] must be tested by the government's custody and control of the warehouses and whisky, and the necessity of the situation so created.

[1] As to the warehouses: The distiller is bound to provide a warehouse on his distillery premises for the storage of distilled spirits of his own manufacture until the tax is paid. When approved and reported on by prescribed federal officers, it becomes a "bonded warehouse of the United States, to be known as a distillery warehouse" and is placed "under the direction and control of the collector of the district, and in charge of an internal revenue storekeeper * * *" (U. S. Comp. Stat. 1901, p. 2122, § 3271), and "in the joint custody of the storekeeper and the proprietor thereof," but must be kept securely locked and not opened except "in the presence of such storekeeper"; and no articles shall be received in or removed from such warehouse "except on an order or permit addressed to the storekeeper and signed by the collector" (page 2124, § 3274). As the spirits are received in the warehouse, the gauger or storekeeper must place upon the head of each barrel an engraved stamp signed by the collector, or storekeeper, and gauger, showing number of proof gallons, name of distiller, date of receipt in warehouse, and serial numbers of barrels in progressive order, and "no two or more casks or packages warehoused at the same distillery shall be marked with the same number" (page 2130, § 3287); the distiller is required within five days after the first of each month to enter the spirits for deposit, and give bond for payment of the tax before removal (page 2133, § 3293); the tax must be paid by the distiller "within eight years from the date of the original entry for deposit" (page 2110, § 3251). Spirits may on payment of the tax be withdrawn from the warehouse on application to the collector (page 2135, § 3294); the gauger must on receiving the collector's order

---

[1] Specimen copy appears in statement.

gauge the spirits in the presence of the storekeeper before removal (pages 2133–2135, §§ 3294. 3295); removal of spirits on which the tax has not been paid is forbidden under severe penalties of fine and imprisonment (page 2136, § 3296).

According to the dates of the warehouse documents, the whisky in question was made in February. March, and April, 1906, and presumably was stored in those months; it might remain there until the corresponding months of 1914.

Examination of these statutory provisions will show them to be very comprehensive. The government requires distillers to furnish distillery warehouses of the kind in question, subject to approval of the Commissioner of Internal Revenue. It has placed them under the direction and control of collectors and in immediate charge of storekeepers with the keys. It has through severe penalties guarded against removal of whisky until the tax is paid. While these means of control and protection do not divest the distiller of title to either warehouse or whisky, it is plain that during the time of storage he is made to surrender the dominion and control of an owner. This is none the less true because the "duty which the revenue officers owe in regard to the security of the warehouse and the safe-keeping of the spirits therein" is to the government. United States v. Witten, 143 U. S. 76, 79, 12 Sup. Ct. 372, 373, 36 L. Ed. 81. Nor is such surrender of dominion and control affected by the joint custody of the warehouse that is given to the storekeeper and proprietor. His property is so exclusively held and dominated by the government, that not even his creditors can seize it through attachment or other process. McCullough, Jr., v. Large (C. C.) 20 Fed. 309. 312; Conard v. Pacific Ins. Co., 31 U. S. 262, 280, 8 L. Ed. 392. It is not a sufficient answer to say, as is earnestly contended by one of learned counsel. that the distiller avails himself of his "right of ownership, possession, or control to inspect and repair the cooperage and to regulate temperature in the warehouse," because he cannot enter or do these things except in presence of the storekeeper. The distiller cannot remove the spirits except on application to the collector and payment of the excise tax. And. aside from removal to other places of storage under formalities and bond (which practically preserve the government's power and control). there is no apparent object of removal during the aging process. The manifest purpose of allowing the spirits to be stored eight years is to enable the distiller to postpone payment of the tax until the spirits ripen into whisky and so become fit for market. The cost of producing whisky obviously requires either the possession of capital, or the means of obtaining it, during this waiting period. Just how much time is so required does not appear, but it is common knowledge that several years must elapse before the spirits can be marketed to the best advantage of the distiller.

[2] As to pledge: We thus reach the controlling question whether this inevitable situation so far removes the product from the control of the distiller as to enable him to pledge or otherwise charge his interest in it. To state the question more specifically: Can it be rightly predicated of this situation that the change of physical possession and

control which takes place between the distiller and the government furnishes a basis for the distiller, through constructive delivery made in virtue of the title remaining in him, either to effect the change of possession requisite to a pledge or to create its substantial equivalent by equitable lien? It is a familiar doctrine that possession is of the essence of a pledge, but that such possession may be constructive instead of actual. Any consideration of the subject must take into account the nature of the thing designed to be pledged. If it be capable of manual delivery, the means of effecting a change of possession are simple; if not, resort is had to constructive delivery. Constructive delivery is controlled by the necessity of the case. The object is to put the pledge under the power and control of the pledgee. Are the custody and control of the government an adequate substitute?

In Casey v. Cavaroc, 96 U. S. 467, 477 (24 L. Ed. 779), it was held that placing with its president bills and notes belonging to a bank for deposit with a firm (of which the president was a member) in pledge to secure a loan made to the bank (and the president turned the securities over to an employé of the bank and they were in fact used by the bank) was not such a change of possession as was necessary to create a privilege by the law of Louisiana; Justice Bradley saying:

"The difference ordinarily recognized between a mortgage and a pledge is that title is transferred by the former, and possession by the latter. Indeed, possession may be considered as of the very essence of a pledge. * * * The possession need not be actual; it may be constructive, as where the key of a warehouse containing the goods pledged is delivered, or a bill of lading is assigned. In such case, the act done will be considered as a token, standing for actual delivery of the goods. It puts the property under the power and control of the creditor. In some cases, such constructive delivery cannot be effected without doing what amounts to a transfer of the property also. The assignment of a bill of lading is of that kind. Such an assignment is necessary, where a pledge is proposed, in order to give the constructive possession required to constitute a pledge; and yet it formally transfers the title also. In such a case, there is a union of two distinct forms of security—that of mortgage and that of pledge; mortgage by virtue of the title, and pledge by virtue of the possession."

The cases of Union Trust Co. v. Wilson, 198 U. S. 530, 25 Sup. Ct. 766, 49 L. Ed. 1154, and Security Warehousing Co. v. Hand, 206 U. S. 415, 27 Sup. Ct. 720, 51 L. Ed. 1117, 11 Ann. Cas. 789, furnish illustrations of what conditions will, and what will not, be regarded as sufficient to exclude the owner from control of goods capable of delivery, which he owns and desires to pledge. In both cases, the place of storage was part of the structure of the pledgor. In the first case, the facts justified the conclusion that a change of possession was wrought; but the facts of the second case induced the court to characterize the scheme as a "mere pretense, a sham." This court in Re Cincinnati Iron Store Co., 167 Fed. 486, 492, 93 C. C. A. 122, 128, held that the fact that pledged iron was stored with distinct marks to identify it on the premises of the pledgor, and placed in the custody of one of its employés, did not invalidate the pledge, "provided the possession was actually changed from the pledgor to the pledgee, and the pledgor's dominion over the property otherwise removed." Again, in Hurley v. Atchison, Topeka & Santa Fé Ry., 213 U. S. 126, 134, 29 Sup. Ct. 466, 469 (53 L. Ed. 729), where a

mining company had contracted to mine and deliver coal sufficient to meet the current needs of the railroad company, but through financial embarrassment was unable to do so, and in order to enable the mining company to keep its agreement the railroad company furnished the mining company with money in advance of the agreed times of payment, it was held that this implied "a purpose that the coal as mined should be delivered, and is from an equitable standpoint to be considered as a pledge of the unmined coal to the extent of the advancement."

The decisions mentioned are amply illustrative of the general law respecting the necessity of change of possession to sustain a pledge, where the pledgor's custody and control admit of such change. It is manifest, however, that there are marked differences between the facts of those cases, also of their class, and the facts of the instant case. True, the government is not a bailee of the whisky, in the sense that it has issued or would issue warehouse receipts to the distiller. Nor is it responsible to the distiller's pledgees as agent or otherwise. But there is a union of interests in the government and the distiller that is important. The distiller, as stated, requires time both to age his whisky and pay the excise tax. The government exacts custody and control of the spirits as a condition of granting the time. The duration of these conditions—this isolation and environment—extends into years. It results that the whisky product becomes an object of recognized value. Is there no lawful way to utilize this value as security?

The present warehouse documents were executed and issued by the distiller. They each apparently bear the signature of a United States gauger, indicating that he gauged the whisky described in the receipts; but there is nothing in the record to show that the original receipts in fact bear his signature. If the gauger did sign them, such act could only amount to an individual statement of the presence of the whisky; it would not bind the government. But it is admitted that Rohrer manufactured the whisky and stored it in the warehouse, and we need not consider that feature of the case. There is much controversy, however, touching possession of the whisky; Pattison claiming that it is in the government, and the trustees that it was in the distiller and is now in them. This results in contention on the part of the trustees that the distiller was nothing more than his own warehouseman respecting his own warehouse receipts. The argument assumes the question. It treats Rohrer's relations to the warehouse and whisky precisely as if his custody and control were absolute and exclusive. It will not do to say either that he was in actual possession, or that he could (without paying the tax and losing the opportunity given to age the spirits) effect a physical change of possession. Union Trust Co. v. Wilson, supra, 198 U. S. 537, 25 Sup. Ct. 766, 49 L. Ed. 1154. The most that he could do was, in virtue of his title, to give constructive possession through symbolic delivery; and then only subject to the rights of the government. And this seems to be just what he attempted to do; for the receipts were given in "conformity" with the laws of the United States, and each contains an agreement that the pledgee shall supply the money to pay the excise tax.

It is urged that the distiller's power through payment of the tax to defeat the attempted pledge reduces the transaction to one of personal obligation alone of the distiller, and in effect destroys the security altogether. Illustration of this is said to be furnished by the fact, admitted in this case, that 590 barrels of the 800 attempted to be pledged were sold and removed from the warehouse by Rohrer without the knowledge of Pattison. Serious as this is, it does not seem to be decisive. It must be conceded that it tends to limit the desirability and value of the whisky as security. But this does not prove that there was no pledgeable interest in the whisky. One test of this may be seen in the apparent right of the pledgee, through seasonable and proper judicial proceedings, to prevent the distiller from exercising his right of withdrawal upon showing his purpose to convert the pledge. It would hardly be claimed that because an agent acting as custodian of a pledge, or because a regular warehouseman, had wrongfully surrendered or otherwise disposed of the pledge to the damage of the pledgee, his fraud would operate to overthrow the settled law sanctioning pledges so made. Nor is the claim tenable that the whisky gave credit to the distiller, and the pledge operated to defraud his general creditors. The whisky was not visible. The public had no access to the warehouses. Taney v. Penn Nat. Bank, 187 Fed. 703, 109 C. C. A. 437 (C. C. A. 3d Cir.); Union Trust Co. v. Wilson, supra, 198 U. S. 538, 25 Sup. Ct. 766, 49 L. Ed. 1154. It is said all trouble could have been avoided by storing in general bonded warehouses. This may be assumed; but it would apply to all distillers, and yet it is not shown that such warehouses are at all adequate. Their selection is within the discretion of the Commissioner of Internal Revenue, and but few of such warehouses seem to have been provided. The possibility, however, of obtaining greater safety and better security does not answer the question whether whisky in distillery warehouses is susceptible of valid pledge.

The present transactions took place in Ohio. There is no statute of the state that appears to affect the present question. In Thorne v. Bank, 37 Ohio St. 254, it was held in respect of hams in the exclusive custody and control of the owners, which apparently could have been changed to the creditor, that (syllabus):

"An instrument in the form of a warehouse receipt, executed by a debtor to his creditor, on property owned by the debtor, who is not a warehouseman, for the sole purpose of securing such creditor, is void as against other creditors, where the property remains in the possession of such debtor."

The case of Hunt v. Bode, Assignee, 66 Ohio St. 255, 64 N. E. 126, presents facts different from those in Thorne v. Bank and recognizes the principle that the delivery must be such as the nature of the case admits. The owner of warehouse receipts representing whisky stored with a warehouseman, delivered them in pledge to a bank, and while the bank was in possession of the receipts the owner pledged his equity in them to another, gave notice of his action to the bank, and it accepted. In the first paragraph of the syllabus it is stated:

"A written pledge or transfer of an interest in warehouse receipts, or choses in action to secure a debt is valid, without actual or manual delivery, where such receipts or choses in action are being held by another

creditor on pledge as collateral security for a loan of money made by him to the same pledgor, or transferror, the second pledge or transfer being equivalent to actual delivery of the property pledged or transferred; and a request by the pledgor or transferror to his first pledgee, that when his debt is paid he deliver the collateral to his other creditor, constitutes sufficient possession of the collateral by such other creditor."

The pledgee of the equity never had actual possession of either the warehouse receipts or the whisky represented by them, and yet the transaction was treated as constituting "sufficient possession of the collateral by such other creditor." This result was reached, as pointed out in the opinion, through the intent of the holder of the equity to deliver possession so far as the nature of the situation would permit. Thus it was said (page 269 of 66 Ohio St., page 128 of 64 N. E.):

"It is the application of the familiar rule that the transfer is complete and delivery made, when the owner has done all that he can do in the premises, and has given such possession to the pledgee or transferee as the nature of the property and its situation will permit. * * * This was all the delivery that could then be made, and it was at least a constructive delivery, and this we think meets the demands of the law."

The principle so recognized is settled; indeed, it is the basis of symbolic delivery. We may add some illustrations to those mentioned earlier herein, ending with that found in Hurley v. Atchison, Topeka & Santa Fé Ry., supra, which related to unmined coal. See 2 Kent's Com. (13th Ed.) pp. 500, 501; Ex parte Fitz, 9 Fed. Cas. 185, involving locomotive engines; MaComber v. Parker, 14 Pick. (Mass.) 497, 505, concerned a pledge of bricks as they were made and held in a brickyard; Bank v. Harkness, 42 W. Va. 156, 167, 24 S. E. 548, 32 L. R. A. 408, had relation to 1,800 barrels of oil in a tank; Nevan v. Roup, 8 Iowa, 207, 211, a pledge of oats contained in rail pens on the lands on which the grain was grown and threshed; Jewett v. Warren, 12 Mass. 300, 301, 7 Am. Dec. 74, a pledge of logs within a boom.

There is also to be added the weight and effect of the custom respecting the pledge of whisky deposited in distillery warehouses. The averments in this behalf are set out in the answer and cross-petition and of course so far as well pleaded are admitted by the demurrer. They are to the effect that these transactions were had in accordance with a custom of trade of more than 40 years' standing, extending throughout the country; that under the custom, distillers, bankers, brokers, and dealers in whisky have during that time treated warehouse documents like these as giving constructive possession of the barrels of whisky and as conveying an interest in the whisky according to the nature of the transaction; and that the receipts have been treated as transferring, through indorsement, the rights of the original holders in the whisky described in them. We cannot under the pleadings accept the suggestion that this custom rests on or is affected by a statute of the state of Kentucky. In Gibson v. Stevens, 49 U. S. 384, 398 (12 L. Ed. 1123), Chief Justice Taney, when speaking of instruments which were regarded by the court as transferring the legal title and constructive possession of certain flour and pork held in warehouses in Indiana, said of the course of trade:

"It has existed long enough to assume a regular form of dealing, and it embraces such a wide extent of territory, and is of such general importance, that its ordinary course and usages are now publicly known and understood; and it is the duty of the court to recognize them, as it judicially recognizes the general and established usages of trade on the ocean. For if, by any decision of this court, doubt should be thrown upon the validity and safety of a contract fairly made according to the usages of this trade, and in the ordinary course and forms of business, the want of confidence would seriously embarrass its operations, to the injury of all connected with it. * * * "

Furthermore, we must test the intent and effect of these warehouse documents as we should if the suit were between Rohrer and Pattison. As Judge Knappen said in Re Cincinnati Iron Store Company, supra, (167 Fed. 492, 93 C. C. A. 128):

"A change of possession to the extent of furnishing notice to third persons becomes immaterial, as no rights of such persons have intervened."

It is to be observed, too, that in Hunt v. Bode the controversy was between the pledgee and the assignee in insolvency of the pledgor; and although a creditor of the assignor prosecuted the case to the Supreme Court, he failed. And in Hurley v. Atchison, Topeka & Santa Fé Ry. Co., supra, it was held (page 134 of 213 U. S., page 469 of 29 Sup. Ct., 53 L. Ed. 729):

"The equitable rights of the parties were not changed by the commencement of bankruptcy proceedings."

See, also, Wilson v. Leslie, 20 Ohio, 161, 166; York Mfg. Co. v. Cassell, 201 U. S. 344, 351, 26 Sup. Ct. 481, 50 L. Ed. 782; Security Warehousing Co. v. Hand, supra, 206 U. S. 424, 425, 27 Sup. Ct. 720, 51 L. Ed. 1117, 11 Ann. Cas. 789; Zartman v. First National Bank, 216 U. S. 134, 138, 30 Sup. Ct. 368, 54 L. Ed. 418.

We are constrained to hold that, as between Rohrer and Pattison, the effect of the delivery of the warehouse documents was to invest Pattison with constructive possession of the barrels of whisky described in the receipts. The warehouse documents contain the substantial elements of well-understood warehouse receipts, and no question is made as to their form. It is clear that Rohrer intended to deliver, and Pattison understood that he was to acquire, constructive possession of the barrels of whisky. This mutual purpose ought to be carried out if it can be. According to the present record, the transactions were entered into in good faith to secure loans of money then made. The descriptions of the warehouses by their numbers and of the barrels containing the whisky dealt with are specific and furnish accurate means of identification. The barrels bear serial numbers, and we have seen that the act provides that:

"No two or more casks or packages warehoused at the same distillery shall be marked with the same number."

We conclude on this record that the action of Rohrer was an appropriation of these barrels of whisky to the purpose of securing Pattison and Pattison alone in respect of moneys then advanced by him. It results that if we are in error in our belief that constructive possession was given, at least an equitable lien on the whisky was created. As the present learned Chief Justice, when speaking of certain mu-

nicipal bonds, said in Walker v. Brown, 165 U. S. 654, 666, 17 Sup. Ct. 453, 457 (41 L. Ed. 865):

"To dedicate property to a particular purpose, to provide that a specific creditor and that creditor alone shall be authorized to seek payment of his debt from the property or its value, is unmistakably to create an equitable lien."

See, also, Fourth Street Bank v. Yardley, 165 U. S. 634, 17 Sup. Ct. 439, 41 L. Ed. 855; Gardner v. National City Bank, 39 Ohio St. 600, 604; Hurley v. Atchison, Topeka & Santa Fé Ry., supra, 213 U. S. 134, 29 Sup. Ct. 466, 53 L. Ed. 729; Bank v. Day, 150 Iowa, 696, 699, 700, 130 N. W. 800.

It must be remembered that we are concerned here with only the 210 barrels of whisky remaining in the distillery. As between Rohrer and Pattison, could Rohrer be heard to say that he did not pledge this whisky, or at least that he did not create an equitable lien upon it? We think not. We have seen that the trustees stand no better than the bankrupt.

Furthermore, instruments similar to those now in issue have been recently upheld in well-considered decisions. In Taney v. Penn Nat. Bank, 187 Fed. 689, 702, 109 C. C. A. 437, 450 (C. C. A. 3d Cir.), Judge Gray cogently discussed the question of the sale of whisky stored in distillery warehouses. A pledge was also involved, and both court and counsel treated the subject of sale as embracing all material questions of pledge. We have purposely refrained from discussing sales. The question does not arise; and we were told in the argument that such an issue is to be presented to the court later. In the course of his opinion Judge Gray said:

"The relation between the distiller and the officers of the government in custody of his whisky is sui generis. It is prescribed by law and is not contractual. But a situation is thereby created, as above described, which in our opinion brings both of the cases before us within what we think is the well-settled rule of law in Pennsylvania, permitting under certain circumstances a valid sale of personal property, as against creditors, to be made in the absence of physical delivery of the property sold."

The case below is reported under the name In re Miller Pure Rye Distilling Co. (D. C.) 176 Fed. 606. Judge McPherson there reached the same conclusion.

Merchants' National Bank of Baltimore v. Roxbury Distilling Co., 196 Fed. 76, was brought in the Circuit Court of the United States for the District of Maryland, and decided by Mr. John Hinkley, Special Master. Distillery warehouse receipts given in pledge were sustained. A statute of Maryland provides that all warehouse receipts issued by a United States distillery warehouse shall be governed by and be subject to the state act as fully as are the warehouse receipts of any warehouseman. Irrespective of the statute, the master said:

"It seems clear to me that there is adequate reason for recognizing the validity of distillery warehouse receipts which has been given to them by long course of dealing by the traders and the banks, and that this contention should prevail. It is a growth and development of the doctrine of constructive or symbolical delivery which I have attempted to trace in this opinion, and of the underlying principle that the courts will recognize as con-

structive delivery that form of delivery which the character and situation of the goods imperatively requires."

He reached the conclusion that the receipts "are valid not only inter partes or against solvent distillers, but absolutely as vesting title in such purchasers or liens in favor of such pledgees, against subsequent creditors." His report was on March 25, 1912, sustained by Judge Morris, who said:

"But independent of the special enactment of Maryland with regard to distillery warehouses, I am in full accord with the special master in his conclusion that because of the peculiar situation of the distilled spirits stored in a bonded distillery warehouse, there is by the transfer effected by the warehouse certificate as full a delivery of the goods as is commercially possible under the special circumstances attending distilled spirits stored in the bonded distillery warehouses of the United States. * * *

"It appears that this constructive delivery is commonly made use of by those dealing in whisky, and money is loaned on pledges of the certificates by banks and others in sums of great magnitude. This is so because whisky usually must be kept in the distillery warehouse five years to mature, and in no other way could the necessary money be raised and the whisky itself be commercially dealt with except by the use of these warehouse certificates representing the whisky."

The order and decree below must be reversed, and the case remanded, with instructions to overrule the demurrer, and for further proceedings not inconsistent with this opinion.