WARD v. FIRST NAT. BANK OF IRONTON, OHIO.

In re IRONTON DOOR & MFG. CO.

(Circuit Court of Appeals, Sixth Circuit. February 14, 1913.)

No. 2,259.

1. BANKRUPTCY (§ 334*)—SECURED CLAIMS—DUTY TO FILE.

A creditor of a bankrupt holding security is not bound to make formal proof of claims against the bankrupt's estate, but may instead rely on his security and enforce it otherwise.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 501–507; Dec. Dig. § 334.*]

2. BANKRUPTCY (§ 214*)—SECURED CREDITOR—CLAIMS—ENFORCEMENT—INTERVENTION.

Where a bank held claims against a bankrupt secured by pledges of specific property and by certain insurance policies, and the proceeds of at least part of the property pledged and of the insurance came into the hands of the trustee, the bank was entitled to enforce its claim by an intervening petition asking that the trustee account and pay over the money to which the bank was entitled without any formal proof by the bank of its debt against the bankrupt.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 320, 324–327, 343, 344; Dec. Dig. § 214.*]

3. BANKRUPTCY (§ 214*)—PLEDGED PROPERTY—DELIVERY.

A bankrupt corporation having certain lumber in specific piles in its yards, a bank agreed to loan the bankrupt a sum equal to 90 per cent. of the value of the lumber which was to be pledged to the bank as security for the loan. The lumber was tagged with the initials of the bank's name, and a diagram of the yard made showing the location of each of the piles and delivered to it. The bank had full control and possession of the lumber pledged, and exercised the right to free access to the yard and to the lumber piles, none of which pursuant to the agreement was removed by the bankrupt without the consent of the bank and paying the full amount for which it was pledged. *Held*, to show a sufficient delivery of the lumber to the bank, and that the pledge was valid.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 320, 324–327, 343, 344; Dec. Dig. § 214.*]

4. PLEDGES (§ 11*)—INSURANCE POLICY—PROCEEDS—EQUITABLE LIEN.

A bank having agreed to loan money to a bankrupt on a pledge of certain lumber, it was agreed that the lumber should be insured, and that the policies should contain a clause that the loss, if any, should be paid to the bank as its interest might appear. This clause was inserted in some of the policies, but, by inadvertence, was omitted from two of them, though all were held by the bank as further security for the loan. A loss having been sustained, and the insurers, under the two policies, refusing to pay the loss to the bank, it delivered the policies to the bankrupt's receiver for collection without any intention to waive or surrender its claim to the proceeds as pledgee. *Held*, that the bank did not thereby waive or lose its right to the proceeds of the policies, but, in any event, had an equitable lien thereon, and was entitled to such proceeds less the cost of collection.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 28–35; Dec. Dig. § 11.*]

Appeal from the District Court of the United States for the Southern District of Ohio; John E. Sater, Judge.

In the matter of bankruptcy proceedings of the Ironton Door & Manufacturing Company. Intervening petition by First National

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

202 F.—39

Bank of Ironton, Ohio, to compel an accounting and surrender of the proceeds of certain securities collected by the bankrupt's trustee. From an order granting the relief prayed, W. G. Ward, as trustee, and C. Crane & Company, appeal.    Affirmed.

Ledyard Lincoln and Chas. H. Stephens, Jr., both of Cincinnati, Ohio, and A. R. Johnson, of Ironton, Ohio, for appellants.

Carmi A. Thompson, of Washington, D. C., and J. L. Anderson and T. N. Ross, both of Ironton, Ohio, for appellee.

Before WARRINGTON and DENISON, Circuit Judges, and EVANS, District Judge.

EVANS, District Judge.  The Ironton Door & Manufacturing Company was incorporated in 1900 under the laws of the state of Ohio, and began business in March, 1901.  On September 7, 1904, on the petition of certain of its creditors, filed in the court of common pleas of Lawrence county, Ohio, and upon the ground that it was unable to pay its debts as they matured or to carry on its business, that court appointed Edmund S. Culbertson its receiver to take charge of the affairs of the corporation.  He continued to operate and conduct its business under the order of that court until October 27, 1904, when the corporation was adjudged a bankrupt by the District Court of the United States for the Southern District of Ohio, which court appointed as its receiver W. G. Ward.  On November 18, 1904, Ward was elected and qualified as the trustee of the bankrupt.

To Ward, as receiver, Culbertson turned over the estate of the bankrupt.  Before he did so the state court ascertained and adjudged that under its orders its receiver, with the consent of the First National Bank of Ironton, Ohio, which we shall hereinafter speak of as the "Bank," had consumed for the benefit of the bankrupt's business and estate certain of the lumber which had come to his hands but which was claimed by the Bank as having been pledged to it.  The value of the lumber thus used was $195.84, and this sum was adjudged by the state court to be a valid and preferred claim against the estate when it directed Culbertson, its receiver, to turn over the assets to Ward. This lumber was used for the benefit of the estate before the adjudication in bankruptcy, and for that and other reasons not necessary to be stated in detail both the referee and the court below held that the Bank should be reimbursed by the trustee for the value of this lumber which had been pledged to it by the bankrupt, and which had been used for the benefit of the bankrupt's estate.  The Bank's claim therefor was accordingly allowed.

In December, 1904, upon the application of Ward, trustee, and after full hearing, the referee made an order directing him to work up certain lumber and material on the bankrupt's premises, which lumber and material were claimed by the Bank as having been pledged to it.  The order of the referee provided that this should all be done without prejudice to the rights of the Bank, and the value of the lumber and material was directed to be deposited as a special fund which was to stand in place of the lumber and be appropriated according to the rights of the parties as they might afterwards be determined.

The amount of lumber and material consumed under this arrangement, including the amount which was sold, was of the value of $3,567.78, which sum made up the special fund referred to.

There were two policies of insurance, each for $700, issued to the bankrupt upon certain parts of its lumber. These policies were delivered by the bankrupt to the Bank, which held them until after the loss occurred. Thereafter they were placed by the Bank in the hands of Ward while he was receiver in the way and for the purpose presently to be shown more in detail, and upon each of them he collected $693—a total of $1,386—and that sum also remains in the trustee's hands to be disposed of by this litigation.

Without making formal proofs of its claims for these three sums, or any of them, on April 30, 1906, the Bank filed its petition in the bankruptcy proceeding and prayed the referee for an order directing the trustee to pay all of them to it. The trustee and C. Crane & Co., the latter being one of the bankrupt's creditors, contested the right of the Bank to the order prayed for, and much testimony was heard upon the issues raised. After very full consideration the referee made an order substantially as prayed for by the Bank. Due proceedings were taken by which the questions involved were brought before the court below, with the result that each of the sums we have mentioned was adjudged to be due the Bank and payment to it was directed. The case was then brought here.

It appears that between December 18, 1902, and September 6, 1904, in pursuance of agreements presently to be more fully stated, the Bank, from time to time, loaned and advanced to the bankrupt large sums, to secure the payment of which it contends there were pledged to it numerous piles of lumber and certain policies of insurance thereon, and the principal question to be determined is whether this contention of the Bank is well founded. On September 6, 1904, much of the lumber covered by the insurance and by the alleged pledges to the Bank was destroyed by fire. On certain policies of insurance issued to the bankrupt but held by the Bank the latter collected $18,500 and applied it toward the payment of that much of the indebtedness due to it from the bankrupt. This latter sum is not directly involved in the present litigation, but the right of the Bank to retain it was much discussed at the argument.

Stating it as briefly as may be consistent with clearness, the arrangement between the bankrupt and the Bank was substantially this: The bankrupt was to execute to the Bank its notes for the money the Bank might loan or advance to the bankrupt from time to time, and payment of these notes was to be secured in both of two ways. One of them was to be by policies of insurance to be obtained by the bankrupt on certain lumber on its yard for its full value, each of the policies to have put upon it a clause or indorsement that the loss thereunder, if any, should be paid to the Bank as its interest might appear. These policies were to be delivered to the Bank. All of this was done except that the clause providing that payment should be made to the Bank as its interest might appear, unintentionally upon the part of the bankrupt and without the Bank's consent or knowledge,

was not put upon the two policies for $700 each, to which we have referred. These two policies, however, like the others, were procured by the bankrupt and with intent to pledge them were delivered to the Bank in pursuance of the agreement and remained in its possession until turned over to the receiver, Ward, for the purpose of being collected. This course became necessary when the insurance company declined otherwise to pay upon discovering, after the fire, that the clause authorizing payment to the Bank had been omitted. The other way of securing payment of the bankrupt's indebtedness to the Bank was by pledges of lumber stacked on the bankrupt's yard. As to this the parties agreed as follows: The lumber was to be put into separate piles, each of which was to be numbered and tagged with the letters "F. N. B.," the initials of the Bank's name. A diagram was to be made of the yard, showing the location of each of the piles of lumber so numbered and tagged, and the diagram was to be delivered to the Bank. The Bank was to have full control and possession of the lumber pledged, and was to have and it did have and it exercised, from time to time, the right of free and full access to the yard and to the piles of lumber so numbered and tagged, and no one of the piles was to be removed by the bankrupt without the consent of the Bank nor without paying the full amount for which it was pledged. The bankrupt was to deliver to the Bank invoices of the lumber showing the amount thereof in each pile and its value, and the Bank was to loan the bankrupt thereon 90 per cent. of that value. The bankrupt was to execute to the Bank its note for each sum so advanced from time to time, and the note was to contain a contract of pledge of the lumber describing the piles and their numbers. In this contract of pledge was also contained a clause which devoted the pledged property generally to the payment of any indebtedness which might be owing from the bankrupt to the Bank as well as the specific note of which it was a part. All of these stipulations, with the exception stated as to the two policies of insurance, were performed, and there is no indication in the record that at the time the respective loans were made, the Bank had reasonable cause to believe or did believe that the bankrupt was insolvent. Nor does the record give any indication that there was anything but perfect good faith in the dealings between the parties. There is nothing, indeed, to indicate that any one of the numerous transactions under these agreements was a mere pretense. And it satisfactorily appears that all of the pledges, whether of lumber or of insurance, were made fairly and for a present consideration.

[1, 2] 1. It is contended that the court below erred in not holding, as was there insisted, that the Bank should have made a formal proof of its claims against the bankrupt's estate. There is no requirement that a creditor holding a security shall do this, although he may do so at his option. He can rely upon his security and enforce it otherwise. Besides, in this instance each of the claims made by the Bank in its intervening petition was, in a specific sense, against the trustee, as such, and not against the bankrupt except in a general way. Under these circumstances the Bank filed its petition before the referee and prayed for an order directing the trustee to pay directly to it certain moneys held by him, but to which, upon the facts it stated, the

Bank claimed to be entitled. We think this was a convenient and proper way to secure a determination of the questions involved, and that a formal proof of debt against the bankrupt was not necessary to that end. Among the authorities supporting this conclusion are In re Goldsmith (D. C.) 118 Fed. 763, and 2 Loveland on Bankruptcy (4th Ed.) § 576, p. 1098, and section 579, p. 1103.

[3] 2. It is a perfectly well-established rule that delivery of possession is indispensable to a pledge of personal property. Indeed, possession is the essence of a pledge. But, while this is the general principle, there frequently is difficulty in determining from the testimony whether in a given case possession was, in fact, passed to the pledgee. Oftentimes this may be a question of much complexity, its solution depending upon a correct interpretation of conflicting evidence. Delivery of possession may be made symbolically; and, while the delivery of the map to the Bank presents characteristics of symbolic delivery, yet we are disposed to believe that the rights of access to and control over the piles of lumber which were given to the Bank and exercised by it present stronger features of actual than of symbolic delivery. Speaking generally, the question of possession may largely depend upon the intention of the parties dealing in good faith and upon the nature and location of the property itself. Also the circumstances of the entire situation may be considered. Here the property was bulky and ponderous. Its removal from the bankrupt's yard to another place of storage would have been difficult and expensive. It was stacked in separate piles, each of which, as we have seen, was numbered and tagged with the initials of the Bank's name. The diagram of the premises furnished by the bankrupt clearly showed the number and location of every tagged pile. The intention of the bankrupt was made clear by thus identifying and segregating the several piles of lumber. Manifestly all this was done to make it certain that the bankrupt's purpose was to give the Bank exclusive dominion and control over the property. It also indicated this purpose by giving the Bank full right of ingress to look after the lumber, which right the Bank freely, and from time to time, exercised. In short, in a way which, under the circumstances, was reasonable and practical, the intention of the parties was given effect.

Upon the facts as we find them from the record we have reached the conclusion that there was, in respect to each pile of the lumber so numbered and tagged, including that used by Culbertson, a delivery of possession to the Bank, and that all the pledges of lumber were thus validated. Many authorities might be cited, but the recent decision of the Supreme Court in Sexton, Trustee in Bankruptcy, v. Kessler, 225 U. S. 90, 32 Sup. Ct. 657, 56 L. Ed. 995, and that of this court in Re Cincinnati Iron Store Co., 167 Fed. 486, 93 C. C. A. 122, so clearly support our conclusion that no others need be mentioned. True, Casey v. Cavaroc, 96 U. S. 467, 24 L. Ed. 779, was much relied upon by counsel for appellant; but, as the court held upon the testimony in that case that possession had not in fact been given, we need give it no further consideration, especially as the distinction is very clear between it and Sexton v. Kessler and In re Cincinnati Iron Store Co., just referred to.

It may again be said that each of the pledges was made in good faith and for a present consideration then passing. It is not contended that pledges thus made would be in violation of the laws of Ohio if possession passed to the pledgee.

3. What we have said in regard to the lumber renders it unnecessary to say anything in regard to the policies of insurance upon which the bank collected the $18,500, except that the conclusion to be drawn from the facts respecting those policies and their delivery to the Bank is quite as apparent as that drawn from the facts respecting the lumber.

[4] 4. As we have seen, two of the policies for $700, each, did not have put upon them the clause directing that the loss thereunder, if any, should be paid to the Bank as its interest might appear. This provision was omitted by inadvertence and without either party noticing the omission. Pursuant to its agreement the bankrupt procured the insurance, and, intending to further perform that agreement and thinking it was doing so, it delivered both of these policies to the Bank in pledge for its indebtedness, and the Bank held them until after the loss. Upon examination made then, the omission was discovered. Without that clause on the policies the insurance company would not pay the loss to the Bank. Then it was that the Bank placed the policies in the hands of the receiver, so that the money might be collected. In doing this, there was no intention on the part of the Bank to waive or surrender its claim, as pledgee, to the proceeds of the policies, nor was there any intention upon its part to waive or abandon its claim to the money thus collected. These facts are made apparent by the testimony. Nevertheless, the trustee has retained the money thus collected. In respect to this phase of the case we hold that as there was an absence of intention to do so on the Bank's part there was no waiver or abandonment of its claim to the proceeds of the policies. Saxlehner v. Eisner & M. Co., 179 U. S. 19, 21 Sup. Ct. 7, 45 L. Ed. 60. Furthermore, we are of opinion that the Bank is entitled as pledgee to the proceeds of the two policies. But, should any doubt exist as to to that view, we are of opinion, upon the facts shown, that the Bank had an equitable lien upon the policies, and is entitled to the money obtained thereon by the receiver and now in the hands of the trustee, subject to the cost of its collection. In addition to the delivery of the policies to the Bank there had been a distinct appropriation of any money collected thereon to the payment of any debt due the Bank from the bankrupt, and an agreement that it should be thus applied. Sexton v. Kessler, 225 U. S. 90, 99, 32 Sup. Ct. 657, 56 L. Ed. 995; Hurley v. Atchison, Topeka & Sante Fé Ry. Co., 213 U. S. 134, 29 Sup. Ct. 466, 53 L. Ed. 729; Pattison v. Dale, 196 Fed. 5, 115 C. C. A. 639; Wright v. Ellison, 1 Wall. 16, 17 L. Ed. 555.

5. Appellant's counsel very strenuously urged upon our attention the case of York Manufacturing Co. v. Cassell, 201 U. S. 344, 26 Sup. Ct. 481, 50 L. Ed. 782. We need only say that that case is in no respect like the one before us. The question there was whether the manufacturing company had a lien upon certain machinery it had supplied under a contract of conditional sale to another who had posses-

sion of it, which contract was not recorded as required by section 4155 of the Revised Statutes of Ohio.

We do not deem it necessary to notice in detail numerous other assignments of error, as those involved in what we have said are decisive of the case.

It results that the judgment of the court below should be, and it is in all respects, affirmed, with costs to the appellee.