MUHLEMAN & KAYHOE, INC., a Corporation of the State of West Virginia, v. JACOB BROWN.

(*November* 30, 1945.)

RODNEY and SPEAKMAN, J. J., sitting.

*Hugh M. Morris* and *Alexander L. Nichols* (of Morris, Steel and Nichols) and *Nathan Patz* (of Baltimore, Maryland) for plaintiff.

*S. Lester Levy* for defendant.

Superior Court for New Castle County, No. 85, September Term, 1944.

SPEAKMAN, J., delivering the opinion of the Court:

The material facts in this case are not in dispute. They were established, either by stipulation or by uncontroverted evidence. Insofar as they are necessary for an understanding of the case, they are as follows:

Prior to August 18, 1943, the McMahon Company was a plumbing sub-contractor under the plaintiff, which was the general contractor for housing projects in the States of Delaware and Maryland. As such sub-contractor, it had, before that date, been paid by the plaintiff substantially the entire amount payable under its contract, without having completed its work. It was also in financial difficulties. The plaintiff was also, at that time contingently liable on materialmen's claims unpaid by the McMahon Company, believed to be about $40,000. The McMahon Company was also indebted to the plaintiff on its note for $20,000, for sums advanced. The McMahon Company had done business in rather a loose way and indiscriminately as a corporation and as a partnership of two or more members, and these various dealings to some extent covered the same period of time. In order to enable the McMahon Company to complete its sub-contract, it entered into an agreement with the plaintiff on August 18, 1943, wherein it was provided that:

"The Partners [McMahon Company] hereby transfer and deliver unto the Contractor [Muhleman & Kayhoe, Inc.] with the right to take physical possession thereof, wherever situate, all materials, equipment, apparatus, supplies, pipe, fittings, valves and other movable chattels and personal property now owned by said Partners or said Corporation, to be held by the Contractor as security for the repayment of any sum or sums due or to become due by the Partners

for or in connection with said Project or their aforementioned Agreement or the advances or loans agreed to be made by the Contractor herein for the purpose of allowing the Partners, as herein stipulated, to complete their undertakings; the Partners and said Corporation hereby describing such assets, without intending to limit to the following, in the following manner, viz: all plumbing and heating materials, supplies, pipe, fittings, valves, etc. now located in or about the premises at the corner of 9th and Church Streets, Wilmington, Delaware, occupied by either of the Partners or Corporation."

Under the agreement, the plaintiff also undertook to arrange, either directly or through another company or firm, to provide further monies for the completion of the sub-contract. Under this arrangement the plaintiff advanced about $35,000, of which the sum of $4,000 was advanced between August 20 and September 16, 1943, which later sum was greater than the value of the property in question at the time of the Collector's sale. No part of the monies so advanced was repaid to the plaintiff.

On or about July 31, 1943, certain Social Security and Unemployment Taxes became due from the McMahon Company. On or about October 31, 1943, additional Social Security and Unemployment Taxes, for the period from June 30 to September 30, 1943, were assessed against the McMahon Company, and on November 16, 1943, notice of the lien asserted by the Government in respect to the taxes was filed in the office of the Recorder of Deeds for New Castle County, in accordance with the provisions of 3672 of *Title 26 U. S. C. A., Int. Rev. Code,* and 3355 of the *Revised Code of Delaware of* 1935.

On or about September 1, 1943, Jesse Cooper, a representative of the Collector, was advised by Joseph V. Minon, then employed as auditor of the McMahon Company, of the

existence of the agreement, of August 18, 1943, between the plaintiff and the McMahon Company.

The plaintiff herein did not, pursuant to the agreement, physically remove the property from the premises of the McMahon Company, where it was stored at the time of the agreement of August 18, 1943, because, according to the testimony, of its weight and bulk, and the expense that would have been involved in removing it to another location. The estimated weight of the property, exclusive of certain sheet metal, was about fifteen tons.

One Flourney, a representative of the plaintiff, came to Wilmington on several occasions after August 18, 1943, to see to the condition and safekeeping of the property, and to exhibit it to possible purchasers. In the early part of October, 1943, he came to Wilmington and made a detailed inventory of the property, and at that time he instructed Joseph V. Minon, the auditor of the McMahon Company, and one Charles McMahon, to take charge of the property for the plaintiff, and not to permit any of it to be removed without the plaintiff's consent. Minon testified that the instructions were acquiesced in and observed by him and the McMahon Company. Some of the sheet metal on the premises, with the knowledge and consent of the plaintiff, was used by the McMahon Company, in connection with its subcontract.

On or about November 1, 1943, the premises occupied by the McMahon Company were practically abandoned by the company, and the property was left on the premises in the condition in which it then was.

On or about January 31, 1944, the Collector made a distraint upon the property. About the last of May or the first of June, 1944, the Collector caused the property to be removed from the premises in which it was located, and stored

it in a nearby warehouse. The removal occupied the time of five or six men for a period of a week, with the use of two trucks.

The property was sold by the Collector on July 1, 1944, after due notice. Prior to the commencement of the bidding, the following announcement was publicly read in the hearing of all persons present at the sale, including the defendant:

"Each of you is hereby expressly warned and notified that Muhleman & Kayhoe, Inc., being entitled to the possession of the chattels proposed to be sold by the Collector and having previously duly notified the Collector of its rights thereto, now publicly advises anyone, including any prospective bidder, that Muhleman & Kayhoe, Inc., will immediately take appropriate legal action for the repossession of such chattels against any person or persons buying or otherwise dealing with such chattels; and any prospective bidder is hereby further notified that any pretended attempt by the Collector to sell such chattels will subject such buyer to the hazard of purchasing a faulty title."

The defendant was the successful bidder at the sale, and the property was sold to him in a single lot, for $3,125. On July 3, 1944, this action was instituted, and on the same day the property was replevied before it had been removed by the defendant from the warehouse in which it was stored. Upon the failure of the defendant to give to the sheriff a property or return bond within a reasonable time, the property was delivered by the Sheriff to the plaintiff.

The plaintiff advances two reasons why it is entitled to judgment:

It first contends that it had, at least, an equitable lien, and that it is not necessary for the Court to determine whether or not the plaintiff had a prior legal lien on the

property, as against the Government, in order to award judgment for the plaintiff in this action.

We are unable to understand how an equitable lien can be the basis for recovery in this action. It is, perhaps, true that by an agreement upon sufficient consideration, and without delivery, a lien on personal property may be created which may be enforceable in equity as between the parties and against purchasers with notice. The present suit is in replevin. None of the authorities cited by the plaintiff go so far as to hold that an equitable lien on personal property is sufficient to support replevin where the action is instituted by the holder of the lien. The rule, as stated in 1 *Pomeroy's Eq. Jur.* (5th Ed.), page 219, is that

"An equitable lien is not an estate or property in the thing itself, nor the right to recover the thing,—that is a right which may be the basis of a possessory action; it is neither a jus ad rem nor a jus in re."

The second contention of the plaintiff is that the facts, as established by the evidence, are sufficient, in law, to create a valid legal pledge of the property in the plaintiff as against the Government, and hence against the defendant, and therefore the plaintiff has, as against the defendant, the right to the immediate and exclusive possession of the property.

The defendant, on the other hand, denies that the plaintiff is entitled to recover, because, as he says, the plaintiff has failed to show that it possessed a valid pledge of the property prior to the date of the Government's lien.

The pertinent provisions of the Federal law providing for a lien for unpaid taxes are *Sections* 3670, 3671 and 3672 of *Title* 26, *U. S. C. A.*, *Int. Rev. Code*, as amended on October 21, 1942. They are as follows:

"3670.  Property subject to lien.

If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, penalty, additional amount, or addition to such tax, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person."

"3671.  Period of lien.

Unless another date is specifically fixed by law [and our attention has not been directed to any other date], the lien shall arise at the time the assessment list was received by the collector and shall continue until the liability for such amount is satisfied or becomes unenforceable by reason of lapse of time."

'3672.  Validity against mortgagees, pledgees, purchasers, and judgment creditors.

"(a)  Invalidity of lien without notice.  Such lien shall not be valid as against any mortgagee, pledgee, purchaser, or judgment creditor until notice thereof has been filed by the collector—

"(1)  Under State or Territorial laws.  In the office in which the filing of such notice is authorized by law of the State or Territory in which the property subject to the lien is situated, whenever the State or Territory has by law authorized the filing of such notice in an office within the State or Territory;  *  *  *."

This State has provided by law for the filing of such notice.  By Section 3355 of the Revised Code of 1935, it is provided that:

"Notices of liens for taxes payable to the United States of America and Certificates discharging such liens shall be

filed in the office of the Recorder of Deeds of the County or Counties in this State, within which the property subject to such lien is situated."

The defendant contends that according to the Federal Act (Section 3671) the United States became a lien holder on September 11, 1943, the date when the assessment list was received by the Collector. He says that

"if there was no pledge on that date, then the lien of the United States was paramount under Section 3671, and Section 3672 has no application; Section 3672 applies only where there is a perfected or unquestioned pledge, and if such pledge is perfected at a subsequent date it would thereby become deferred to the lien of the United States."

This contention of the defendant is fully answered by Chancellor Wolcott in the case of *Ferris v. Chic-Mint Gum Co.*, 14 *Del. Ch.* 232, 233, 124 A. 577. In that case the mortgage, which was dated and recorded on September 12, 1922, was given to the mortgagee by the insolvent debtor to secure a pre-existing debt. The prayer of the petition was that

"the principal and interest due on its mortgage may be ordered paid to it prior to all other claims except tax claims due the County of New Castle and the City of Wilmington and a claim held by said city as a sewer lien."

One of the claims filed in the proceedings was that of the United States of America for sundry taxes aggregating $18,349.41, of which $3,587.27 appeared on the assessment lists which were received by the Collector prior to September 12, 1922, the date of the recordation of the mortgage, and the balance thereof, viz. $14,762.14, was certified and received by the Collector subsequent to said date.

The Chancellor found that there was a demand for payment of all the Federal taxes, and a neglect or refusal to pay, and he said:

"Therefore the taxes acquired the effect of liens in so far as *Section* 3186 [now as amended 3670, 3671 and 3672 of *Title* 26, *U. S. C. A., Int. Rev. Code*] could confer on them that quality."

In the course of his opinion, the Chancellor used this language:

"The statute under which the United States claims its lien expressly declares that the same 'shall not be valid as against any mortgagee * * * until notice of such lien shall be filed by the collector in the office of the clerk of the district court,' etc. Notice of these liens was never filed in the office of the clerk of the district court. Therefore they are not liens as against the mortgagee unless the statute is to be so interpreted as to read into it a qualification confining the term 'mortgagee' to that class whose mortgages were obtained to secure a contemporaneous debt, and excluding from its scope, that class of whom this mortgagee is one, whose mortgages were obtained to secure an antecedent indebtedness. It is admitted that the term 'mortgagee' is broad enough in its literal meaning to embrace the petitioner in this case. Nothing has been adduced here which would justify the court in going over into the field of unrelated equitable doctrines to borrow an idea as justification for writing into the language of the act something by way of exception which the Congress itself saw fit to omit."

The conclusion of the Chancellor was that as to the taxes assessed and certified both before and after September 12, 1922, the date of the mortgage, the claim of the United States was junior to that of the mortgage.

█ █ In the present case, notice of the tax lien was filed in the office of the Recorder of Deeds for New Castle County on November 16, 1943. The vital question for our determination is whether there was before that date a suf-

ficient delivery by the taxable of the property to the plaintiff and a retention thereof by the plaintiff to create a valid pledge as against the Government. If there was such a valid pledge as against the Government, it would also be valid against the defendant, especially by reason of the notice given prior to the commencement of the bidding at the sale on July 1, 1944, in the hearing of the defendant, to the effect that the plaintiff was entitled to the possession of the chattels proposed to be sold by the Collector.

The defendant says that "the obvious issue is whether the plaintiff had the lien of a pledge," meaning, of course, superior to the lien of the Government. Whether it did have such a lien, he argues, depends, in part, on whether the plaintiff took possession of the goods under the alleged contract. He contends that in the reported cases where reference is made to the fact that the articles are weighty, reference is being made to heavy machines or objects attached to the ground, so that they cannot be moved without great trouble or expense. We think the same rule would apply where the property consists of a large mass, such as wheat in an elevator, coal in a dealer's yard, or as in the present case, a large quantity of pipes, fittings, and plumbing supplies.

The defendant further says that a pledgee must do all in his power to effect a transfer, and in support of this he cites but one case, it being *Philadelphia Warehouse Co. v. Winchester,* (*C. C.*) 156 *F.* 600. In many respects that case is similar to the case before us. The defendant directs attention to the fact that in that case

"(a) The pledge took a lease of the premises. (b) Ample signs were erected to give notice. (c) Schedule of the articles covered thereby was delivered to the pledgee at the time of the execution of the original contract. (d) An agent was appointed whose duty was independent and dis-

tinct from his regular duty; appointment was in writing setting out his duties to pledgee; he was to keep an accurate account thereof; and he was under bond."

He points out, in effect, that these steps were not taken in the instant case. In the Philadelphia Warehouse case Judge Bradford was of the opinion that what was done there was sufficient to effectuate a valid pledge, he did not hold that less would not have been sufficient.

■ ■ There are numerous cases in which it is recognized that there is no positive rule of law that pledged property on the premises of the bailor need be in any way marked for the purpose of giving notice to the public of the pledge. They hold that it is enough if the goods are set apart from other property on the premises of the bailor, with instructions by the bailee to the person in charge to notify others that the property is held in pledge. The cases also recognize that there is no positive rule of law which would invalidate a pledge where the property is left on the bailor's premises with his consent, with a person left in charge of the bailed property, where such person is in the employ of the pledgor, if the employee's duty is independent of his regular duty to his employer. Many of the cases are collected and annotated in 133 *A. L. R.* 209.

In the leading case of *Sumner v. Hamlet,* 12 *Pick.* (*Mass.*) 76, certain manufacturers of cloth agreed to give to the defendant, one of their creditors, security for his claim. For this purpose, one Guild, an employee of the manufacturers, selected and set apart a number of pieces of cloth, pursuant to authority previously given by the manufacturers. The pieces of cloth were subsequently removed and kept by Guild in a lower room in the factory in which he worked, and notice thereof was given to one of the manufacturers and to two workmen who were in the employ of Guild. Sometime later, the cloth was taken under an attachment in favor of

another creditor of the manufacturers. In his opinion, Chief Justice Shaw said:

"We are of opinion, that the selecting and setting apart of these pieces by Guild, in pursuance of an authority previously given him by the proprietors, before the claim of any other person intervened, constituted a lien thereof, for the indemnity and security of the defendant, to the same effect as if the same selection and appropriation had been made by the proprietors themselves.

"We are also of opinion, that the lien thus created was maintained by the possession of Guild. Whatever was the nature of his general relation to the proprietors of the manufactory, in this particular transaction he was constituted the special agent of the defendant, for the purpose of keeping possession for him, although in other respects the servant of Stanley & Co [the proprietors], and pursuant to the power thus given him, he was both authorized and bound to retain the goods against the original proprietors, for use of the defendant. To constitute such special possession, it was not necessary that the goods should be removed from the premises of the former owners; it was sufficient that they were so far in the custody of the special bailee, that he could at all times have the legal control of them, and give notice of the lien to any purchaser and attaching creditor, and remove the goods if such removal should be necessary for the safety of the principal."

Other cases in which the facts are similar to those in the present case, and in which the opinions are fully in accord with *Sumner v. Hamlet, supra,* are *Grand Ave. Bank v. St. Louis Union Trust Co.,* 135 *Mo. App.* 366, 115 *S. W.* 1071; *Dunn v. Train,* (1 *Cir.*) 125 *F.* 221; *In re Cincinnati Iron Store Co.,* (6 *Cir.*) 167 *F.* 486.

See also *Casey v. Cavaroc,* 96 *U. S.* 467, 24 *L. Ed.* 779; *Kentucky Furnace Co.'s Trustee v. City Nat. Bank,* 75 *S. W.*

848, 25 *Ky. Law Rep.* 28; *Combs v. Tuchelt,* 24 *Minn.* 423; *Ward v. First Nat. Bank,* (6 *Cir.*) 202 *F.* 609; *Haskins v. Fidelity Nat. Bank,* 93 *Wash.* 63, 159 *P.* 1198; *Daragh v. Elliotte,* (6 *Cir.*) 215 *F.* 340; *In re Cross,* (*D. C.*) 244 *F.* 844.

We think that the rule as laid down in *Sumner v. Hamlet, supra,* is not only supported by the great weight of authority, but that it is the only safe and reasonable rule to follow where the facts are such as those which exist in the case before us.

██ ██  It is not claimed, nor does it appear that the agreement of August 18, 1943, between the plaintiff and the McMahon Company, was not made in good faith and for a sufficient consideration. Under its terms the plaintiff had the right "to take possession * * * of all materials, equipment, apparatus, supplies, pipe, fittings, valves and other movable chattels and personal property" then owned by the partnership or the McMahon Company. In conformity with the agreement, Flourney, a representative of the plaintiff, went upon the premises of the taxable, in Wilmington, where the property was stored, in the early part of October, 1943, made an inventory of it, and instructed Minon and Charles McMahon to take charge of the property of the plaintiff. These instructions were acquiesced in and followed by Minon and McMahon. We think that from that time and thereafter the possession of the property was removed from and continued out of the possession of the taxable, and Minon and McMahon became the special bailees of the plaintiff, with the duty to give notice to prospective purchasers, attaching creditors or other parties entitled to notice, that the plaintiff was entitled to the possession of the property, as pledgee of the owner. In this case it was not necessary for the special bailees to furnish notice to third persons, as no rights of such persons intervened prior to the Collector's sale. At the Collector's sale the defendant was

given ample notice to put him upon inquiry as to the plaintiff's rights and claims.

■ Although the Collector had notice of the agreement of August 18, 1943, on or about September 1 of that year, the absence of such notice would not have affected the plaintiff's rights, for, as was aptly said by the Chancellor, with respect to the mortgagee's rights in *Ferris v. Chic-Mint Gum Co., supra*:

"But the petitioner [mortgagee], the one prior in point of legal right, by taking the mortgage can in no sense be said to have deceived the Federal Government, or to have induced it to act to its prejudice. The government's claim being for taxes automatically arose. It was in no wise induced or procured to be incurred by the prior mortgagee."

For the above reasons, judgment will be entered in favor of the plaintiff and against the defendant for six cents, besides costs.